# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

_____

| | | |
|---|---|---|
| **HARRISON KERR TIGRETT** | ) | |
| **MAXINE SMITH, RUSSELL** | ) | |
| **SUGARMON, REGINA M.** | ) | |
| **SUGARMON, JAMES WESLEY** | ) | |
| **GIBSON II, KATHY BUCKMAN** | ) | |
| **GIBSON, MIKE CARPENTER, and** | ) | |
| **MARTAVIOUS JONES,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.10-2724-STA-tmp** |
| | ) | |
| **ROBERT E. COOPER, JR., in his** | ) | |
| **Official Capacity as Attorney General of** | ) | |
| **the State of Tennessee, TRE HARGETT,** | ) | |
| **in his Official Capacity as Secretary of** | ) | |
| **State of the State of Tennessee,** | ) | |
| **TENNESSEE DEPARTMENT OF** | ) | |
| **STATE: DIVISION OF ELECTIONS,** | ) | |
| **SHELBY COUNTY ELECTION** | ) | |
| **COMMISSION, WILLIAM GIANNINI,** | ) | |
| **MYRA STILES, J.H. JOHNSON,** | ) | |
| **ROBERT D. MEYERS, and STEVE** | ) | |
| **STAMSON, in their official capacities as** | ) | |
| **members of the Shelby County Election** | ) | |
| **Commission,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

_____

Before the Court is Defendants' Motion to Dismiss (D.E. # 56), filed on June 24, 2011.

Plaintiffs filed a Response on August 8, 2011 (D.E. # 63), and Defendants filed a Reply on

August 24, 2011 (D.E. # 64).  For the following reasons, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

**BACKGROUND**

This action challenges the validity of Tennessee constitution art. XI, § 9 and Tenn. Code Ann. § 7-2-106, which govern procedures for the consolidation of city and county governments into one metropolitan government.  Plaintiffs filed their Complaint for declaratory, preliminary, and injunctive relief on October 7, 2010.  (D.E. # 1.)  The Court granted a preliminary injunction enjoining Defendants from certifying the results of a referendum vote on a proposed charter for the Memphis Shelby County Metropolitan Government.  (D.E. # 27.)  Defendants then moved to dismiss on mootness grounds, as the vote in the non-Memphis population of Shelby County and the combined vote of Memphis and non-Memphis residents rejected the proposal in the November 2, 2010, referendum vote.  (D.E. # 31.)  The Court denied Defendant's Motion to Dismiss under the "capable of repetition yet evading review" exception to the mootness doctrine. (D.E. # 38.)

Next, the Town of Arlington ("Arlington") filed a Motion to Intervene (D.E. # 42) on March 29, 2011.  The City of Bartlett ("Bartlett"), the Town of Collierville ("Collierville"), the City of Germantown ("Germantown"), and the City of Millington ("Millington") filed their own Motion to Intervene (D.E. # 53) on June 6, 2011.[1]  The Court denied those Motions on October 21, 2011.  (D.E. # 68.)  Arlington, Bartlett, Collierville, and Germantown filed a Motion to Reconsider this ruling on November 18, 2011 (D.E. # 71), and that Motion remains pending

---

[1]     The Court will collectively refer to these five cities and towns as "the Suburban Municipalities."

before the Court.  Defendants filed the Motion to Dismiss currently before the Court on June 24, 2011.  (D.E. # 56.)

The following facts are taken as established for the purposes of this Motion.  On August 26, 2009, and September 15, 2009, the City of Memphis ("the city" or "Memphis") and Shelby County, Tennessee ("Shelby County"), respectively, established the Memphis and Shelby County Metropolitan Government Charter Commission ("the Commission").  (Compl. ¶ 20.) The Commission was tasked with writing and proposing a charter for a metropolitan government to the voters of Memphis and Shelby County.  (*Id.*)  The Commission adopted the Charter of the Memphis Shelby County Metropolitan Government ("the Charter") on August 9, 2010.  It filed the Charter with the Shelby County Election Commission ("SCEC") on August 10, 2010, and requested that the Charter and the proposed new government's name be placed on a ballot and submitted to a referendum vote to be held on November 2, 2010.  (*Id.* ¶ 21.)

Under the constitutional and statutory provisions at issue in this case,[2] the Charter could not be adopted by the voters of Memphis and Shelby County unless a majority of qualified voters residing in Memphis ("city voters") and a separate majority of qualified voters residing in Shelby County outside Memphis ("non-city voters") separately approved it.  (*Id.* ¶ 24.)  This calculation method is commonly referred to as a "dual-majority voting requirement."  (*Id.*)  The dual-majority voting requirement was added to Tennessee's constitution in 1953, and the enabling legislation was initially enacted in 1957.  (*Id.* ¶ 22.)  In 1962 and 1973, referendum votes were held pursuant to these provisions in an attempt to form a metropolitan government in

_____

[2]        The Court will quote the full text of these sections in its analysis section.

Shelby County.  (*Id.* ¶ 25.)  In both of those elections, the referendum failed outside Memphis.  (*Id.*)

About 73% of the entire population of Shelby County resides in Memphis, and the remaining 27% of the population of Shelby County resides outside Memphis.  (*Id.* ¶ 26.)  Thus, the votes of non-city residents are weighted in a ratio of 2.5 to 1 to the votes of City residents.  (*Id.* ¶ 27.)  Moreover, African-Americans make up approximately 66% of the population of Memphis and 52% of the population of all of Shelby County.  (*Id.* ¶ 42.)  African Americans make up approximately 44% of Shelby County's non-city population.  (*Id.* ¶ 43.)  Plaintiffs state that "[v]oting procedures such as the dual-majority voting requirement result in prima facie discrimination in the election process and enhance the opportunity for intentional discrimination."  (*Id.* ¶ 28.)  Plaintiffs assert that the dual-majority voting requirement has caused them irreparable harm and injury by denying them an equal opportunity to participate in the electoral process.  (*Id.* ¶ 29.)

The Complaint contains two Counts for Relief.  First, Plaintiffs allege a violation of the Equal Protection clause.  Second, Plaintiffs point to a violation of the Voting Rights Act.  As to Count One, Plaintiffs state that they are registered voters eligible to vote in all Shelby County elections, and they aver that they intended to vote in the referendum vote at issue.[3]  (*Id.* ¶ 31.)  Plaintiffs assert their fundamental right under the Fourteenth and Fifteenth Amendments of the U.S. Constitution to have their votes count equally with the votes of all other citizens of Shelby County in all Shelby County elections and referenda.  (*Id.* ¶ 32.)  They assert that their votes

_____

[3]  Plaintiffs have not amended their Complaint to indicate whether they voted in the November 2010 referendum.

should not be diluted in weight when compared to other citizens of Shelby County. (*Id.* ¶ 33.) Plaintiffs assert that their eight collective votes would be diluted when compared to the votes of eight comparable Shelby County voters living outside Memphis.[4] (*Id.* ¶ 35.) These eight non-city residents would have a comparative voting strength of twenty votes, as compared to Plaintiffs' eight, under the dual-majority voting system. (*Id.*) Plaintiffs argue that this dilution violates the constitutional guarantee of equal protection, and the disparity in weight based on city or non-city residence equates to a violation of their right to equal representation. (*Id.* ¶ 36.) Plaintiffs conclude that "[t]here is no rational basis to treat the vote of a Shelby County voter who resides within . . . Memphis as having less weight than the vote of a Shelby County voter who resides outside [Memphis]." (*Id.* ¶ 38.)

Additionally, the Minority Plaintiffs are four members of the African-American population majority residing in Memphis. (*Id.* ¶ 39.) They argue that "[t]he present [s]tate constitutional and statutory dual-majority [voting] requirement for the upcoming referendum unconstitutionally dilutes the weight of . . . minority voters . . . resulting in invidious discrimination in violation of the Fourteenth and Fifteenth Amendments of the [U.S.] Constitution." (*Id.*) They state that the votes of African-American voters in Memphis counted for less than one-half of the votes of white Shelby County voters residing outside Memphis. (*Id.* ¶ 39.)

---

[4] All eight Plaintiffs reside in Memphis. (*Id.* ¶ 3-10.) Plaintiffs Smith, Russell Sugarmon, James Gibson, and Jones ("the Minority Plaintiffs") are African-American. (*Id.* ¶ 4-5, 7, 10.) Plaintiffs Tigrett, Regina Sugarmon, Kathy Gibson, and Carpenter ("the Majority Plaintiffs") are Caucasian. (*Id.* ¶ 3, 6, 8-9.)

As to Count 2, Plaintiffs note that, in the late 1800s, the State of Tennessee enacted laws affecting the rights of African-American Tennesseans to register to vote and otherwise participate in the democratic process. (*Id.* ¶ 44.) Moreover, African-Americans have historically constituted a substantial percentage of Memphis's population. (*Id.* ¶ 45.) However, since its incorporation, Memphis's African-American residents have not had the opportunity to participate equally in the political processes of the city. (*Id.*) Furthermore, in Shelby County, African-American citizens have historically been subjected to direct private and official discrimination in the exercise of their right to vote. (*Id.*) For example, until the 1960s and 1970s, Shelby County's African-American citizens were officially segregated in nearly every area of public life, including access to parks, libraries, recreation centers, and other similar facilities. (*Id.* ¶ 46.)

Additionally, voting in Memphis and Shelby County has historically been racially polarized. (*Id.* ¶ 47.) In many elections, political campaigns have been characterized by subtle or even overt racial appeals. (*Id.*) Plaintiffs also assert that "African-American citizens in Memphis and Shelby County have historically been politically and geographically cohesive." (*Id.* ¶ 48.) Not only do they suffer socioeconomic disparities—caused in part by the legacy of discrimination—in areas of education, employment, and health, which hinder their effective participation in the electoral process, but they are sufficiently numerous and geographically compact to form an effective voting majority. (*Id.* ¶ 50-51.)

Plaintiffs state that the dual-majority voting prerequisite to establishing a metropolitan government assures that, however cohesive the African-American citizens of Memphis and Shelby County may be as a voting bloc, they can be defeated by a cohesive voting bloc of fewer

white voters residing in Shelby County outside Memphis.  (*Id.* ¶ 49.)  Thus, Plaintiffs conclude that the dual-majority voting requirement's dilution of African-American voting strength in all of Shelby County denies Shelby County's African-American citizens an equal opportunity to participate in the electoral process in violation of the Voting Rights Act.  (*Id.* ¶ 52-53.)

In their Prayer for Relief, Plaintiffs requested four primary forms of relief.  They seek a declaration that the dual-majority voting requirement violates the Fourteenth and Fifteenth Amendments by impermissibly diluting the voting strength of Memphis voters and African American voters in Memphis in countywide consolidation referenda.  (*Id.* at 13-14.)  They also pray for a declaration that the dual-majority voting requirement violates Section 2 of the Voting Rights Act by impermissibly diluting the voting strength of African-American voters in countywide consolidation votes.  (*Id.* at 14.)

Plaintiffs also prayed for an injunction enjoining the canvassing and counting of the November 2, 2010, referendum vote, but the Court found this remedy to be moot, lifted the preliminary injunction, and allowed the November 2, 2010, referendum vote results to be certified.  (Order Denying Mot. to Dismiss, D.E. # 38, at 9.)  Therefore, while this specific injunctive relief is no longer before the Court, Plaintiffs' injunctive relief requesting an injunction "protecting their right to have each of their votes and those of all Shelby County citizens living in . . . Memphis counted equally," located in the last paragraph of Count One, is still before the Court.

## STANDARD OF REVIEW

### Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") permits dismissal of a complaint for "lack of subject-matter jurisdiction."[5] "When the defendant challenges subject matter jurisdiction, the plaintiff has the burden of proving jurisdiction and the court may resolve factual disputes."[6] "A Rule 12(b)(1) motion can either attack the claim of [subject matter] jurisdiction on its face . . . or it can attack the factual basis for [subject matter] jurisdiction . . . ."[7] In reviewing a Rule 12(b)(1) motion challenging the factual basis for jurisdiction, "a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts."[8]

Eleventh Amendment immunity is an issue of jurisdiction, but the issue is no longer classified as simply a question of subject matter jurisdiction.[9] Although a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may not be procedurally correct, all that is required to properly raise this affirmative defense to jurisdiction is a motion citing to the Eleventh Amendment itself.[10] In this case, Defendants have properly raised this issue.

### Rule 12(b)(6)

---

[5]       Fed. R. Civ. P. 12(b)(1).

[6]       *Robinson v. Ohio, Dep't of Dev.*, 69 F. App'x 204, 205 (6th Cir. 2003) (citing *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).

[7]       *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

[8]       *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

[9]       *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526 n.13 (6th Cir. 2004) (quoting *Ernst v. Roberts*, 379 F.3d 373 (6th Cir. 2004)).

[10]      *Id.* (quotation and internal punctuation omitted).

Additionally, a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). However, because they filed an Answer (D.E. # 39) before filing this Motion to Dismiss, the Court will treat this Motion as a motion for judgment on the pleadings under Rule 12(c).[11] When the Rule 12(b)(6) defense is raised by a Rule 12(c) motion for judgment on the pleadings, courts apply the standard for reviewing a Rule 12(b)(6) motion.[12]

When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pled factual allegations of the complaint as true, construe those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the plaintiff.[13] However, legal conclusions "masquerading as factual allegations" or unwarranted factual inferences including "conclusory allegations" need not be accepted as true.[14] To avoid dismissal under Rule 12(b)(6), "the complaint must contain either direct or inferential allegations" with respect to all material elements of the claim.[15]

Under Rule 8 of the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"[16] Although

---

[11]     *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11 (6th Cir. 1987); Fed. R. Civ. P. 12(c); Fed. R. Civ. P. 12(h)(2).

[12]     *See Morgan*, 829 F.2d at 11.

[13]     *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2007).

[14]     *Id.*

[15]     *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

[16]     Fed. R. Civ. P. 8(a)(2).

this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."[17]  To survive a motion to dismiss, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."[18]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[19]

## ANALYSIS

The following provisions constitute the constitutional and statutory provisions challenged in this case.  Tennessee's constitution provides in pertinent part that

> [t]he General Assembly may provide for the consolidation of any or all of the governmental and corporate functions now or hereafter vested in municipal corporations with the governmental and corporate functions now or hereafter vested in the counties in which such municipal corporations are located; provided, such consolidations shall not become effective until submitted to the qualified voters residing within the municipal corporation and in the county outside thereof, and approved by a majority of those voting within the municipal corporation and by a majority of those voting in the county outside the municipal corporation.[20]

Section 9's enabling legislation, codified at Tenn. Code Ann. § 7-2-101 *et seq.*, describes the referendum vote procedure as follows:

> The special referendum election shall be held on a date fixed by the county election commission not less than eighty (80) days nor more than one hundred (100) days subsequent to the filing of the charter as provided in § 7-2-105. Notice

---

[17]     *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1953 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  *See also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009).

[18]     *Iqbal*, 129 S. Ct. at 1949-50; *Twombly*, 550 U.S. at 570.

[19]     *Iqbal,* 129 S. Ct. at 1949.

[20]     Tenn. Const. art. XI, § 9.

of the referendum election shall be given as required in other elections on questions submitted to the vote of the people. The date of the election and the form of ballot shall be uniform throughout the entire county, but the county election commission shall canvass the returns and certify the results as if separate elections were being held for the principal city and for the area of the county outside of the principal city of the county.

For the purpose of determining whether the proposed charter has been accepted or rejected, the county election commission shall canvass the returns and certify the results: (1) [f]or the principal city; and (2) [f]or the entire area of the county outside of the principal city, including in such area the smaller cities, if any, within the county.[21]

The dual-majority voting requirement at issue is contained in the following two subsections:

The proposed charter shall be deemed ratified and adopted if the proposed charter is approved by a majority of those voting within the principal city and also a majority of those voting in the county outside of the principal city. The proposed charter shall be deemed rejected and shall not become effective if it is disapproved by a majority of those voting in the principal city. The proposed charter shall also be deemed rejected and shall not become effective if it is disapproved by a majority of those voting in the county outside of the principal city.[22]

The Tennessee state government steps in after certification by the county election commission:

The returns of the referendum election shall be certified by the county election commission to the secretary of state, together with a copy of the charter previously filed with the county election commission by the charter commission. Thereupon, the secretary of state shall issue a proclamation showing the result of the election on the adoption or rejection of the proposed charter, one (1) copy of which proclamation shall be attached to the copy of the charter certified to the secretary of state and one (1) copy of which shall be delivered to the county clerk, who shall attach the proclamation to the copy of the charter certified to the county clerk. Whenever a charter for metropolitan government has been adopted, the two (2) certified copies with proclamations attached to the certified copies shall be deemed duplicate original copies of the charter of the metropolitan government. The certified copy of the charter and proclamation deposited with the county clerk

---

[21]     Tenn. Code Ann. § 7-2-106(b). It is undisputed that Memphis is the principal city in Shelby County.

[22]     *Id.* § 7-2-106(c)-(d).

shall subsequently be delivered by the county clerk to the officer of the metropolitan government that the metropolitan charter may direct.[23]

## Sovereign Immunity of the State Defendants

The U.S. Constitution's Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."[24]  In essence, the Eleventh Amendment reestablished the concept of state sovereign immunity and stands for the proposition that states cannot be sued in either state or federal court.[25]  Several exceptions to this doctrine exist.  For example, the *Ex Parte Young* doctrine carves out an exception to sovereign immunity, allowing suits seeking equitable relief against state officials for ongoing violations of federal law.[26]  *Ex Parte Young* "rests on the premise . . . that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign immunity purposes.[27]  This legal fiction "does not apply when the state is the real, substantial party in interest," which can occur when the relief prayed for "would require an expenditure from the public treasury or interfere with public administration."[28]

---

[23]     *Id.* § 7-2-106(e).

[24]     U.S. Const. amend. XI.

[25]     *See generally Hans v. Louisiana*, 134 U.S. 1 (1890).

[26]     *See generally Ex Parte Young*, 209 U.S. 123 (1908).

[27]     *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011).

[28]     *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984); *Ford Motor Co. v. Dep't of Treasury of Ind.*, 323 U.S. 459, 464 (1945)).

Accordingly, *Ex Parte Young* allows federal courts to grant prospective relief "against state officials to force compliance with federal law."[29] When determining whether to apply the *Ex Parte Young* exception, courts "conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."[30] Indeed, "[c]omplaints based entirely upon past acts and not continuing conduct that, if stopped, would provide a remedy to [plaintiffs] do not implicate the [*Ex Parte Young*] doctrine."[31] For example, an ongoing violation of federal law can arise from enforcement of a state's bar admission rules or an agreement which violates federal law.[32]

Declaratory judgments form part of the injunctive relief allowed for under *Ex Parte Young*.[33] For a court to grant an exception to sovereign immunity declaratory relief under *Ex Parte Young*, it must take care to ensure that the declaratory relief satisfies both of the requirements articulated in Supreme Court jurisprudence. That is, the declaratory relief must both address an ongoing violation of federal law and be prospective in nature.[34] Where there is

---

[29]     *Banas v. Dempsey*, 742 F.2d 277, 285 (6th Cir. 1984). This prospective relief could issue for violations of federal statutes, common law, or the U.S. Constitution.

[30]     *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring), *cited in Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

[31]     *Perez v. Wade*, 652 F. Supp. 2d 901, 906 (W.D. Tenn. 2009) (quoting *Gean v. Hattaway*, 330 F.3d 758, 776 (6th Cir. 2003)).

[32]     *See Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 615-17 (6th Cir. 2003); *Mich. Bell Tel. Co. v. Climax Tel. Co.*, 202 F.3d 862, 868 (6th Cir. 2000).

[33]     *See Johnson v. Unknown Dellatifa*, 357 F.3d 539, 545 n.1 (6th Cir. 2004) (plaintiffs can "avoid the sovereign immunity bar by suing for injunctive or declaratory relief, rather than monetary relief."); *Dubuc*, 342 F.3d at 616; *Hamilton v. Myers*, 281 F.3d 520, 526 (6th Cir. 2002).

[34]     *See Coeur D'Alene*, 521 U.S. at 296 (O'Connor, J., concurring).

no ongoing violation of federal law or reason to issue an injunction, a declaratory judgment will not be an available remedy as against the state due to sovereign immunity.[35]  Declaratory relief is not prospective as required by the *Ex Parte Young* doctrine when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.[36]

Under the general prayers for relief in a complaint, it appears to be widely accepted that district courts retain discretion to extend relief beyond the bounds of the specific prayers for relief requested in a complaint.[37]  As such, courts are not confined to the relief requested in the Prayer for Relief, and they can look to other portions of the complaint to determine whether plaintiffs request additional relief not specifically delineated in the Prayer for Relief.

In the Complaint, Plaintiffs request declaratory relief stating that the dual-majority voting requirement contained in Tennessee's constitution and statutory law violates the Fourteenth and

---

[35]     *Cotton v. Mansour*, 863 F.2d 1241, 1249 (6th Cir. 1988).

[36]     *Dye v. Off. of Racing Comm'n*, 692 F. Supp. 2d 706, 712 (E.D. Mich. 2010).

[37]     *See, e.g.*, *Walden v. Bodley*, 39 U.S. 156 (1840); *Watts v. Waddle*, 31 U.S. 389 (1832) (holding that although plaintiffs were not entitled to the specific relief they requested, the allegations in the complaint that defendants had been in possession of the land in controversy entitled plaintiffs to recover rents and profits under the prayer for general relief); *Avco Corp. v. Aero Lodge No. 735, Ass'n of Machinists & Aero Space Workers*, 263 F. Supp. 177, 180 (M.D. Tenn. 1966) (applying *Watts* and holding that plaintiffs' allegations of breach of contract and the complaint's facts provided a sufficient basis for an award of damages under the general prayer for relief); *Liquid Carbonic Corp. v. Goodyear Tire & Rubber Co.*, 38 F. Supp. 520, 525 (N.D. Ohio 1940) ("There is nothing in the intricacy of equity pleading that prevents the plaintiff from obtaining the relief under the general prayer, to which he may be entitled upon the facts plainly stated in the bill. . . . If a bill states a cause of action entitling [a] complainant to equitable relief on any theory of the case, a court may grant it under a prayer for general relief, though other specific relief may be mistakenly prayed for.").

Fifteenth Amendments and the Voting Rights Act.[38]  They do not limit their request to the specific referendum vote on November 2, 2010; instead, their requested relief pertains to impermissible vote dilution in all "countywide consolidation elections."[39]  They also request "an injunction from this Court protecting their right to have each of their votes and those of all Shelby County citizens living in Memphis counted equally."[40]

In their Motion to Dismiss, Defendants focus on the *Ex Parte Young* doctrine and argue that it does not apply to them in this case: accordingly, they aver that sovereign immunity shields them from suit.[41]  They assert that *Ex Parte Young*'s applicability has been narrowly construed by federal courts, and that narrow construction requires the state officials sued under *Ex Parte Young* to take some action or have some connection with the enforcement of the allegedly unconstitutional statute to trigger *Ex Parte Young*.[42]  They assert that the Complaint "does not contain any allegations of actions taken or threatened to be taken by any of the State Defendants with respect to Plaintiffs' claims."[43]  They argue that "none of the State Defendants have any connection or authority with respect to the enforcement of Art. XI, Section 9 or Tenn. Code Ann. § 7-2-106(c)" other than their certification of the referendum vote results.[44]  Defendants assert

---

[38]  (Compl. at 13-14.)

[39]  (*Id.*)

[40]  (*Id.* ¶ 40.)

[41]  (Defs.' Mot. to Dismiss, D.E. # 56-1, at 10-11.)

[42]  (*Id.* at 9-10.)

[43]  (*Id.* at 11.)

[44]  (*Id.*)

that this minimal involvement is insufficient to trigger *Ex Parte Young* and remove the cloak of sovereign immunity.[45]

In Response, Plaintiffs distinguish the cases relied upon by Defendants.[46]  They assert that because they seek "both a declaratory judgment and a permanent injunction declaring that [the] dual-majority voting requirement impermissibly dilutes the voting strength of all voters residing in Memphis," they seek prospective relief, which satisfies one of the requirements of the *Ex Parte Young* doctrine.[47]  Plaintiffs also assert that they have alleged an ongoing violation of federal law, and they imply that the unconstitutional state statute's continued existence violates federal law.[48]  They attack Defendants' argument that none of them have a connection or authority to enforce the statute at issue by noting that Tenn. Code Ann. § 8-6-109(b)(9) obligates the Attorney General to defend the constitutionality of all legislation with statewide applicability.[49]  As such, Plaintiffs argue that the Attorney General is statutorily required to defend this case, and Plaintiffs' requested prospective declaratory and injunctive relief falls within the *Ex Parte Young* exception to sovereign immunity.[50]

In reply, Defendants point to two fallacies in Plaintiffs' arguments.  First, they contend that the Complaint does not request injunctive relief of the State Defendants, as the Prayer for

---

[45]  (*Id.*)

[46]  (Pls.' Resp., D.E. # 63, at 7.)

[47]  (*Id.*)

[48]  (*Id.* at 7-8.)

[49]  (*Id.* at 8.)

[50]  (*Id.* at 8-9.)

Relief specifically prays for an injunction restraining the action of the SCEC rather than the State Defendants.[51]  Second, they argue that the Court dismissed the injunctive relief against the SCEC as moot, and as such, the Complaint no longer contains a request for injunctive relief, thereby rendering inapplicable *Ex Parte Young*'s exception to sovereign immunity.[52]

The Court finds that the *Ex Parte Young* exception applies to Defendants in this case, and sovereign immunity will not serve to shield them from involvement in this lawsuit.  First, the Complaint contains allegations of an ongoing violation of federal law: it states that the dual-majority voting requirement violates the U.S. Constitution and the Voting Rights Act, and any future consolidation votes under that requirement would thus be in violation of federal law. Although another consolidation referendum vote is not currently scheduled, the Court has found the case to still be a live controversy under the capable of repetition yet evading review exception to the mootness doctrine.[53]  Just as the legal issues in the Complaint remain before the Court, all of the relief requested in the Complaint except for that mooted in the Court's February 17, 2011, Order is before the Court as well.  The case would not be a live, justiciable controversy without an ongoing violation of federal law or an applicable exception under the mootness doctrine.  Therefore, an imminent referendum vote is not necessary for the Court to find that an ongoing violation of federal law exists; that any future referendum vote would likely raise the same legal issues as those raised by Plaintiffs in this case is enough to for the Court to find an ongoing violation of federal law.

---

[51]     (Defs.' Reply, D.E. # 64, at 2.)

[52]     (*Id.* at 3-4.)

[53]     (D.E. # 38.)

Second, Plaintiffs request declaratory and injunctive relief, which is relief "properly characterized as prospective." The Court need not confine its analysis to the relief alleged in the Prayer for Relief; requests for relief elsewhere in the Complaint are sufficient to place Defendants on notice of the general character of relief sought by Plaintiffs. Plaintiffs' requested declaratory relief, found in the Prayer for Relief, involves declaring that the Tennessee constitutional and statutory provisions at issue are unconstitutional. Plaintiffs' requested injunctive relief can be found both in the Prayer for Relief, which prays for an injunction—which the Court has found to be moot—prohibiting the SCEC from canvassing and counting the November 2010 referendum vote, and in Paragraphs 40 and 54 of the Complaint, which request injunctions prohibiting the enforcement of the provisions at issue.[54]

---

[54] Paragraph 40, the final paragraph in Count One, provides as follows:

> Based upon the facts set forth herein above, Plaintiffs aver that they are entitled to (1) *legal and equitable relief in the form of an injunction from this Court protecting their right to have each of their votes and those of all Shelby County citizens who live within the City of Memphis counted equally*; (2) *an order requiring that their votes and those of all other Shelby County registered voters who reside in the City of Memphis be given equal weight in the consolidation referendum with the votes of all other Shelby County citizens, including those of voters who reside outside the City of Memphis*; and (3) reasonable fees and other reasonable expenses as part of their costs.

(Compl. ¶ 40 (emphasis added).) Paragraph 54, the final paragraph in Count Two, states as follows:

> *Unless enjoined by this Court*, Tennessee's dual majority voting requirement will remain in force, and the [SCEC] will therefore continue to violate Section 2 of the Voting Rights Act by administering, implementing, and conducting all future consolidation [votes], including the one scheduled to take place on November 2, 2012, pursuant to the dual-majority voting requirement.

(Compl. ¶ 54 (emphasis added).) The Court reasonably interprets these paragraphs to request injunctive relief, especially in light of the italicized language.

Consequently, the Court finds Defendants' argument that the Complaint does not contain any live injunctive or declaratory relief to be unsupported by the provisions of the Complaint. The Complaint fairly and adequately alleges prospective relief sufficient to satisfy the Court's inquiry under *Ex Parte Young*.

Moreover, Defendants' argument minimizes the importance of an additional fact: the state is required to be involved in the announcement and proclamation of referendum results taking place under the challenged constitutional provision and its enabling legislation. Although the state does not count the votes at issue or certify the election results, it is required to approve of them and "issue a proclamation showing the result of the election."[55] This proclamation is the final step in the allegedly unconstitutional activity arising under the dual-majority voting requirement: assuming the provisions at issue are unconstitutional, the results of a vote under those provisions would be unconstitutional as well. Thus, the logical next step, certification of the results by the SCEC, would be unconstitutional, and the final step in the enabling legislation, the state's proclamation of those unconstitutional certified results, would result in unconstitutional action as well. Accordingly, the Court finds that Defendants take action under the challenged legislation, and their action under Tenn. Code Ann. § 7-2-106(e) would be so tainted with unconstitutionality—if indeed the underlying provisions are unconstitutional—that the *Ex Parte Young* exception to sovereign immunity must apply to them.

Consequently, both prongs of the Court's required inquiry are satisfied: the Complaint alleges prospective relief which will remedy an ongoing violation of federal law. Therefore, the Court finds that the *Ex Parte Young* exception to sovereign immunity applies, and sovereign

---

[55]     Tenn. Code Ann. § 7-2-106(e).

immunity will not protect the State Defendants from being sued in this case. Thus, Defendants'

Motion to Dismiss the State Defendants on the basis of sovereign immunity is **DENIED**.

### Fifteenth Amendment

The Fifteenth Amendment provides as follows: "The right of citizens of the United States

to vote shall not be denied or abridged by the United States or by any State on account of race,

color, or previous condition of servitude."[56] Because the parties confine their arguments to vote

dilution as the grounds for Defendants' alleged violation of the Fifteenth Amendment, the Court

will similarly confine its examination of the relevant law.

Current Supreme Court authority acknowledges that vote dilution does not form a

competent platform upon which to base an alleged violation of the Fifteenth Amendment.[57]

When the Supreme Court first addressed the issue in 1980, it suggested that "the Fifteenth

Amendment applies only to practices that directly affect access to the ballot:"[58]

> The answer to the appellees' argument is that . . . their freedom to vote has not
> been denied or abridged by anyone. The Fifteenth Amendment does not entail the
> right to have [African-American] candidates elected. . . . Having found that
> [African-Americans] in Mobile 'register and vote without hindrance,' the District
> Court and Court of Appeals were in error in believing that the appellants invaded
> the protection of that Amendment in the present case."[59]

---

[56]     U.S. Const. amend. XV, § 1.

[57]     *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000).

[58]     *Mobile v. Bolden*, 446 U.S. 55, 84 n.3 (1980) (Stevens, J., concurring).

[59]     *Id.* at 65.

In 1993, the Supreme Court again reiterated that it had never held that vote dilution violates the Fifteenth Amendment.[60]

The Complaint argues that the dual-majority voting requirement "unconstitutionally dilutes the weight of . . . minority voters, resulting in invidious discrimination in violation of the . . . Fifteenth Amendment."[61]  In their Motion, Defendants cite to *Mobile v. Bolden* and aver that the Fifteenth Amendment applies only to practices directly affecting access to the ballot box.[62] After pointing out that Plaintiffs have not stated that they were unable to vote in the November 2010 referendum, and that they have not amended their Complaint to allege interference with their ability to vote, Defendants argue that Plaintiffs have necessarily failed to state a claim for vote dilution under the Fifteenth Amendment under current Supreme Court precedent.[63]

In response, Plaintiffs contend that even though the Supreme Court has not held that vote dilution is a cognizable claim under the Fifteenth Amendment, the Supreme Court "has never held that vote dilution *does not* violate the Fifteenth Amendment."[64]  In the absence of guidance from the Supreme Court, Plaintiffs argue that their Fifteenth Amendment claim is not invalid and

---

[60]     *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote dilution claims; in fact, we have never held any legislative apportionment inconsistent with the Fifteenth Amendment."); *see also Holder v. Hall*, 512 U.S. 874, 920 (1994) (Thomas, J., concurring in the judgment) ("The Court has never decided, however, whether the Fifteenth Amendment should be understood to protect against vote 'dilution.'").

[61]     (Compl. ¶ 39.)

[62]     (Defs.' Mot. to Dismiss, D.E. # 56-1, at 13.)

[63]     (*Id.* at 13-14.)

[64]     (Pls.' Resp., D.E. # 63, at 9 (emphasis in original).)

urge the Court not to dismiss it.[65]  In reply, Defendants point to the Supreme Court's language in *Reno v. Bossier Parish* as indicating that the Supreme Court is not "leaning towards a finding that a claim for vote dilution exists under the Fifteenth Amendment."[66]

The Court is unpersuaded by Plaintiffs' arguments regarding vote dilution's viability as a cause of action under the Fifteenth Amendment.  Under current law, vote dilution does not give rise to a cause of action under the Fifteenth Amendment.  Unless and until a court with higher authority rules to the contrary, for the Court to allow Plaintiffs' Fifteenth Amendment claim to proceed under a vote dilution theory would be to step beyond the bounds of clearly delineated precedent into the sphere of speculation.  Accordingly, the Court finds that Plaintiffs have failed to state a claim for vote dilution under the Fifteenth Amendment, and Defendant's Motion to Dismiss their Fifteenth Amendment claim is **GRANTED**.

<u>Standing of the Majority Plaintiffs</u>

"Standing" can refer to two distinct areas of law.  Traditionally, it refers to "whether a plaintiff can satisfy Article III's case or controversy requirement."[67]  This constitutional standing is analytically distinct from statutory standing, which asks "whether *this* plaintiff has a cause of action under [a given] statute [or provision]."[68]  Statutory standing is a matter of statutory

---

[65]        (*See id.* at 9-10.)

[66]        (Defs.' Reply, D.E. # 64, at 4.)

[67]        *Roberts v. Hamer*, 655 F.3d 578, 580 (6th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[68]        *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 n.2 (1998)).

construction, not jurisdiction, and when a plaintiff lacks statutory standing, his or her claim should be dismissed under Rule 12(b)(6) rather than for lack of subject matter jurisdiction.[69]

In a footnote, Defendants aver that the Majority Plaintiffs "have no standing to bring a claim for relief under the Fifteenth Amendment, which applies only to a denial or abridgement 'on account of race, color, or previous condition of servitude.'"[70] Plaintiffs do not respond to this argument.

Notwithstanding its ruling dismissing Plaintiffs' Fifteenth Amendment claim, the Court finds that the Majority Plaintiffs would not have standing to bring a claim for vote dilution under the Fifteenth Amendment even if vote dilution was a cognizable cause of action. The Majority Plaintiffs' votes would not be impermissibly diluted on the basis of their race. Therefore, the Court finds that the Majority Plaintiffs lack standing to bring suit for vote dilution under the Fifteenth Amendment.

## Equal Protection

The Fourteenth Amendment's Equal Protection clause provides that the the a state shall not "deny to any person within its jurisdiction the equal protection of the laws."[71] In their Complaint, Plaintiffs present two classifications which are affected by vote dilution in violation of the Equal Protection clause: dilution of the African-American vote as compared to the Caucasian vote and dilution of the votes of city citizens as compared to the votes of non-city citizens.

---

[69]    *Id.* at 581.

[70]    (Defs.' Mot. to Dismiss, D.E. # 56-1, at 14 n.39.)

[71]    U.S. Const. amend. XIV, § 1.

At the outset, the Court notes that statutes involving suspect classifications or infringing on fundamental rights are subject to strict scrutiny.[72] When courts apply strict scrutiny to a state statute, the statute is presumed unconstitutional unless the state can justify it by presenting a compelling government interest and show that the statute is narrowly tailored to serve that interest.[73] But if a statute does not involve suspect classifications or does not infringe on fundamental rights or liberty interests, it is subject to rational basis review.[74]

When courts apply rational basis review to a state statute, the statute is presumed constitutional, and the group attacking the statute has the burden of "attacking the legislative arrangement to [negate] every conceivable basis which might support it."[75] Notably, "[a] classification does not fail rational basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'"[76] Nor must a legislature articulate its rationale at the time it makes the classification at issue; instead, a classification "must be upheld against [an] [E]qual [P]rotection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."[77] Thus, rational basis review tests

---

[72]     *See Loving v. Virginia*, 388 U.S. 1, 11 (1967); *Harper v. Va. Bd. of Elections*, 383 U.S. 633, 672 (1966).

[73]     *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011).

[74]     *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

[75]     *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

[76]     *Id.* (quoting *Dandridge v. Williams*, 497 U.S. 471, 485 (1970)).

[77]     *Id.* (quoting *FCC v. Beach Comm'ns, Inc.*, 508 U.S. 307, 313 (1993)).

where there is "a rational relationship between the disparity of treatment and some legitimate governmental purpose."[78]

Therefore, the level of scrutiny applied to a statute can be outcome-determinative of its constitutionality. With these fundamental principles of constitutional law in mind, the Court will first turn to those classifications in which strict scrutiny could be implicated—dilution of the Minority Plaintiffs' votes and dilution of the city residents' votes implicating their fundamental right to vote as interpreted by the one person, one vote principle—before addressing Plaintiffs' final Equal Protection challenge: the dilution of city residents' voting strength as compared to that of non-city residents.

<u>Dilution of African-American voting strength</u>

Without doubt, any classification based on race must be analyzed under strict scrutiny.[79] However, whether a court applies strict scrutiny or rational basis to a race-based classification resulting in vote dilution can turn on the language of the law at issue; if a statute is not discriminatory on its face, courts must delve deeper to determine whether the statute actually classifies "based on race." This case presents just such a situation. Section 7-2-106 does not contain an express racial classification in its language; thus, it is facially neutral, and the Court will not automatically apply strict scrutiny.

When a law is facially neutral, strict scrutiny is applied only if the plaintiffs can prove that it was "motivated by a racial purpose or object."[80] Sometimes this inquiry is "relatively

---

[78]     *Id.* (citation omitted).

[79]     *See, e.g.*, 543 U.S. 499, 505 (2005).

[80]     *Miller v. Johnson*, 515 U.S. 900, 913 (1995).

easy," such as when "the effect of government action is a pattern 'unexplainable on grounds other than race.'"[81] More often, the evaluation of whether a facially neutral law is motivated by a racial purpose is "an inherently complex endeavor, . . . requiring [courts] to perform 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"[82] This "sensitive inquiry" is guided by five factors articulated in *Arlington Heights*:  (1) the historical background of the decision to enact the law, particularly if it reveals a series of official actions taken for invidious purposes; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence, as they might also afford evidence that improper purposes are playing a role; (4) substantive departures, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; and (5) legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body contained in minutes of its meetings or reports.[83]

Notably, "absent a stark pattern of racial discrimination, [disparate] impact alone is not determinative" in a court's evaluation of whether a facially neutral statute evidences a discriminatory intent.[84]  As the Sixth Circuit has said, "[p]roving that a law has a racially discriminating impact, without more, is therefore insufficient to establish a violation of . . . the

---

[81]     *Id.* (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Shaw v. Reno*, 509 U.s. 630, 644 (1993).

[82]     *Arlington Heights*, 429 U.S. at 266.

[83]     *Id.* at 266-68.

[84]     *Id.* at 265.

Fourteenth Amendment."[85]  Accordingly, plaintiffs must provide proof of racially discriminatory intent or purpose to show a violation of the Equal Protection clause.[86]  While this discriminatory purpose must be at least a motivating factor in the legislation's enactment, it need not be the dominant or primary factor.[87]

In their Motion, Defendants argue that the Court should apply rational basis review to section 7-2-106 and the Tennessee constitution.  Defendants begin by noting that the challenged provisions are facially neutral and that, consequently, some proof of discriminatory intent or purpose is required.[88]  They argue that the Complaint contains several allegations about the disparate impact of the challenged provisions, but that disparate impact alone is not enough to state a claim for an Equal Protection violation.[89]  Furthermore, the Complaint does not address any of the *Arlington Heights* factors.[90]  Defendants point to the results of the November 2010 referendum vote and note that it passed in Memphis by less than 1% of the vote while failing in Shelby County outside Memphis.  According to Defendants, the referendum was "overwhelmingly rejected" by a vote of 142,721 to 81,574 across the population of the entire county, and "in light of such results, any impact on African-American voters within . . . Memphis resulting from [the] application of the dual-majority vot[ing] requirement [was]

---

[85]     *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 369 (6th Cir. 2002).

[86]     *Arlington Heights*, 429 U.S. at 265.

[87]     *Id.* at 265-66.

[88]     (Def.'s Mot. to Dismiss, D.E. # 56-1, at 21.)

[89]     (*Id.* at 21-22.)

[90]     (*Id.* at 22.)

minimal at best."[91]

In response, Plaintiffs focus most of their arguments on the provisions' infringement on their fundamental right to vote and assert that strict scrutiny should apply.[92]  Such arguments are more relevant to the Court's second and third Equal Protection inquiries below, and the Court will address these arguments more thoroughly at that time.  Plaintiffs quote their Complaint and state that an application of  "the Court's liberal pleading requirements" demonstrates that they adequately pled that the facially neutral provisions at issue "ha[d] an adverse effect and [that their] passage was motivated by discriminatory animus."[93]  Plaintiffs aver that they are not required to explicitly plead the *Arlington Heights* factors to survive a motion to dismiss, and that they did in fact allege the *Arlington Heights* factor regarding "the impact of the State action on a particular group."[94]  Finally, Plaintiffs argue that Defendants' assertions about the delegates' actions and statements at the 1953 Constitutional Convention "underscore the need for discovery."[95]

In reply, Defendants reframe the issue as "whether . . . [P]laintiffs have adequately alleged that racial discrimination was a substantial or motivating factor behind the enactment of the constitutional and statutory dual-majority vot[ing] requirement."[96]  They state that Plaintiffs'

---

[91]     (*Id.* at 23.)

[92]     (Pls.' Resp., D.E. # 63, at 10.)

[93]     (*Id.* at 14-15.)

[94]     (*Id.* at 15.)

[95]     (*Id.*)

[96]     (Defs.' Reply, D.E. # 64, at 5.)

quoted Complaint paragraphs do nothing more than assert a disparate impact on racial minorities, and the Supreme Court has said that disparate impact is not enough to state a claim for vote dilution.[97]  Defendants also counter Plaintiffs' asserted need for discovery by stating that "it is simply too late to conduct discovery to learn the motives of the proponents of" the provisions at issue, and "the published legislative history clearly reflects an 'obvious alternative explanation' to support the propriety of the constitutional provision."[98]  As such, Defendants aver that Plaintiffs have not alleged, "nor can they prove in light of the circumstances, facts essential to establish that the discrimination of which they complain is intentional," and their Equal Protection claim should be dismissed.[99]

The Court finds neither of the parties' arguments to be wholly persuasive or on point; although the parties have addressed which level of scrutiny should apply, they have not bridged the gap between the level of scrutiny ultimately selected by the Court and the end result of dismissal or survival of Plaintiffs' Equal Protection claim.  For example, Defendants' Equal Protection section closes with two assertions: the provisions at issue were not racially motivated, and Plaintiffs' Complaint fails to state a claim under the Equal Protection clause.  Defendants do not connect the provisions' lack of discriminatory intent and how that lack of discriminatory intent results in the dismissal of the action.  Missing from their briefing is an analysis of the challenged provisions' alleged rational bases and why they should be upheld.  Similarly, Plaintiffs' briefing focuses on the applicability of strict scrutiny and the need for discovery; they

[97]        (*Id.*)

[98]        (*Id.* at 6.)  The Court notes that Defendants have not asked the Court to take judicial notice of this published legislative history.

[99]        (*Id.* at 7.)

do not address Defendants' rational basis argument, argue that the provisions have no rational basis,[100] or articulate why the provisions would fail under strict scrutiny. As such, the Court's findings on Plaintiffs' race-based vote dilution Equal Protection challenge cannot proceed beyond its evaluation of which level of scrutiny applies.

Based on the facts contained in Plaintiffs' Complaint and current Supreme Court precedent, the Court finds that rational basis review applies to Plaintiffs' allegations of race-based vote dilution. First, the provisions at issue are facially neutral; therefore, to trigger strict scrutiny, Plaintiffs needed to plead that the provisions were motivated by racial animus, purpose, or intent. But the Complaint contains no such *factual* allegations. Plaintiffs point to Paragraph 28 as indicating that the challenged provisions were enacted with a discriminatory purpose. But pleading the legal conclusion that "voting procedures such as the dual majority voting requirement result in *prima facie* discrimination in the election process and *enhance the opportunity for intentional discrimination*" is not enough to adequately plead racial animus, purpose, or intent under *Twombly* and *Iqbal*. Indeed, these legal conclusions masquerading as factual assertions are insufficient to trigger strict scrutiny.

---

[100]     The Court acknowledges that Plaintiffs' Complaint states that "[t]here is no rational basis to treat the vote of a Shelby County voter who resides within the City of Memphis as having less weight than the vote of a Shelby County voter who resides within the [municipalities] of Millington, Bartlett, Germantown, Collierville, or Arlington." (Compl. ¶ 38.) However, the Court's reliance on this assertion is inappropriate for two reasons. First, the existence or lack of rational basis for a provision is a legal conclusion, and under *Twombly* and *Iqbal*, courts are not to consider legal conclusions in their evaluation of a Motion to Dismiss. Second, Plaintiffs assert a lack of rational basis as it pertains to their residency-based Equal Protection claim. This claim is separate from their race-based Equal Protection claim, and the Court finds that mixing of arguments from one claim to the other could result in confusion. Therefore, the Court will disregard Plaintiffs' assertion that "there is no rational basis" for the challenged provisions' residency classification.

Furthermore, it would be quite the stretch to read Plaintiffs' allegations of an "enhancement of the opportunity for intentional discrimination" as asserting that intentional discrimination took place when the provisions at issue were enacted. The Court will not give such conclusory statements that broad of an interpretation. To permit Plaintiffs to go on a fishing expedition in search of discriminatory intent, purpose, or animus based on this threadbare implication of discriminatory intent would be impermissible under *Twombly* and *Iqbal*.

Second, Plaintiffs are correct in that they have pled that the provisions result in a disparate impact on Memphis' African-American voters. However, under current Supreme Court precedent, allegations of disparate impact alone—without allegations that discriminatory intent, purpose, or animus played a part in the enactment of the law at issue—are insufficient to trigger strict scrutiny. The Court again declines Plaintiffs' implicit invitation to overrule the Supreme Court. Based on this precedent and Plaintiffs' failure to plead facts sufficient for the Court to infer any discriminatory intent, purpose, or animus, the Court finds that the facially neutral provisions at issue do not merit strict scrutiny. As such, the Court will review Plaintiffs' race-based vote dilution claim using a rational basis standard.

However, based on the briefing submitted to the Court, the Court feels it wise to withhold its determination of whether the challenged provisions are constitutional until the parties can engage in discovery and provide full briefs to the Court. Although it is a close call, after viewing all of the Complaints' facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have sufficiently stated a claim for race-based vote dilution under the Equal Protection clause. However, the Court will apply rational basis review to this specific claim. Therefore, Defendants' Motion to Dismiss Plaintiffs' race-based vote dilution claim under the Equal

Protection clause is **DENIED**.

<u>Dilution of Memphis citizens' voting strength</u>

In their Complaint, Plaintiffs aver that they have a fundamental right to have their votes counted equally with the votes of all other Shelby County citizens under the one person, one vote principle.[101]  This principle also protects their vote from dilution in weight when compared to other citizens in Shelby County outside Memphis.[102]  Plaintiffs allege that the provisions at issue unconstitutionally dilute their votes by causing the vote of a non-city resident to have 2.5 more times the weight than the corresponding vote of a city resident.[103]  They state that this "disparity . . . is such an unacceptable and impermissible deviation from the constitutionally required equal weight to be given to votes and from the equal population ideal requirement for voting blocks [sic] within political entities and/or subdivisions that the deviation is presumptively unconstitutional and invalid."[104]  In addition to arguing that the dual-majority voting requirement produces a "presumptively unconstitutional" result, they also state that there is "no rational basis" for the disparity between the weights of individuals' votes in Memphis and the remainder of Shelby County.[105]

In their Motion, Defendants argue that "while application of [the challenged provisions] implicates the right to vote, under established Supreme Court precedent, these constitutional and

---

[101]    (Compl. ¶ 32-33.)

[102]    (*Id.* ¶ 33.)

[103]    (*Id.* ¶ 34.)

[104]    (*Id.* ¶ 37.)

[105]    (*Id.* ¶ 37-38.)

statutory provisions should be judged under a rational basis standard."[106]  Defendants thoroughly

review *Town of Lockport*[107] and note that the Supreme Court held that "differing interests of city

and non-city voters are sufficient under the Equal Protection Clause to justify the classifications

made by the New York and constitutional and statutory provisions" containing dual majority

vote requirements.[108]  Defendants then argue that the Tennessee provisions' legislative history

"clearly demonstrates that the differing interests of city voters and county voters were precisely

the reason for the dual majority vote requirement."[109]  Accordingly, Defendants contend that vote

dilution arising from the reliance and recognition of these differing interests does not violate the

Equal Protection clause.[110]

     In response, Plaintiffs recharacterize the issue before the court by citing numerous

Supreme Court cases discussing the fundamental right to vote and the application of strict

scrutiny to cases infringing on it.[111]  As such, Plaintiffs contend that the challenged provisions

infringe on their fundamental right to vote by diluting their votes beyond the one person, one

vote principle, thereby triggering strict scrutiny.[112]  They then turn to *Town of Lockport* and note

that the Supreme Court did not explicitly determine that rational basis was the appropriate

---

[106]    (Defs.' Mot. to Dismiss, D.E. # 56-1, at 15.)

[107]    *Town of Lockport v. Citizens for Cmty. Action at the Local Level, Inc.*, 430 U.S. 259 (1977).

[108]    (Defs.' Mot. to Dismiss, D.E. # 56-1, at 15-17.)

[109]    (*Id.* at 18-20.)

[110]    (*Id.* at 20.)

[111]    (Pls.' Resp., D.E. # 63, at 10.)

[112]    (*Id.* at 11.)

standard of review for the issue in that case.[113]  Finally, Plaintiffs "acknowledge that [*Town of* *Lockport* raises issues similar to those raised in the instant case" but argue that "Defendants' reliance on [the case] is, at best, premature."[114]  They argue that *Town of Lockport* and other decisions relied on by Defendants were at the summary judgment stage of litigation, with record factual evidence upon which the courts could base their rulings, and that their Equal Protection claim should be allowed to proceed to discovery and summary judgment as well.[115]  Defendants' Reply focuses on the racial discrimination argument raised by Plaintiffs and addressed by the Court above; they do not address Plaintiffs' one person, one vote arguments.

As such, the parties' characterization of the Equal Protection issues relating to the classification of voters based on city and non-city residency will affect the level of scrutiny applied, which will likely affect the outcome of this claim.  Plaintiffs have characterized the dual-majority vote requirement as an infringement on their fundamental right to vote as interpreted in *Reynolds v. Sims*' one person, one vote equal weight requirement.[116]  Such an infringement would merit strict scrutiny.  On the other hand, Defendants have focused on the basis for the dual-majority vote requirement: the differing interests in city-county consolidation between city and non-city voters.  As discussed below, this classification would appear to merit rational basis review.  Accordingly, the Court will first address Plaintiffs' one person, one vote argument before turning to Defendants' *Town of Lockport* argument.

---

[113]    (*Id.*)

[114]    (*Id.*)

[115]    (*Id.* at 11-13.)

[116]    *See generally Reynolds v. Sims*, 377 U.S. 533 (1964).

**Classification based on one person, one vote**

It is undisputed that the right to vote is a fundamental right.[117]  This right "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."[118]  Thus, Equal Protection protects the right of a citizen to equal representation and to have his vote weighted equally with those of all other citizens.[119]  Vote dilution is key to stating a successful claim under the Equal Protection clause: "the intentional creation of majority-minority districts does not give rise to an [E]qual [P]rotection claim absent proof that the districting diluted the majority's voting strength."[120]

The Court acknowledges the cases preceding and following *Reynolds v. Sims* and understands that in typical vote dilution cases, which arise from reapportionment or redistricting for voting in representative elections, courts generally apply strict scrutiny.  However, the case before the Court presents an issue of a wholly different sort: it pertains not to vote dilution of a class's votes for their representatives as part of the republican form of government but to vote dilution in a "single-shot"[121] up-or-down referendum vote on a single issue.

---

[117]    *See generally id.*

[118]    *Id.* at 555.

[119]    *Id.* at 576.

[120]    *United Jewish Orgs. of Williamsburg, Inc. v. Carey*, 430 U.S. 144, 165 (1977).

[121]    The Supreme Court referred to the charter vote at issue in *Town of Lockport* as a "single shot" referendum.  *Town of Lockport*, 430 U.S. at 266.  Although the Court acknowledges that a consolidation referendum could occur more than once, the referendum is a simple "yes or no" vote on one issue which does not require voters to select a person to represent their voices in a school board, county commission, state general assembly, or the federal Congress.  As such, the Court does not think its characterization of the consolidation referendum vote as a "single shot" is unmerited.

Indeed, *Town of Lockport* addressed the tension between the *Reynolds v. Sims* one person, one vote principle and the type of referendum presented by this case. In *Town of Lockport*, the Supreme Court began its analysis by reviewing *Reynolds v. Sims*' one person, one vote principle and noted that that principle "emerged [in cases] involv[ing] challenges to state legislative apportionment systems."[122] But the Supreme Court then distinguished the one person, one vote principle applicable in representative elections from the consolidation referendum vote similar to that at issue here:

> The equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives are of limited relevance, however, in analyzing the propriety of recognizing distinctive voter interests in a "single shot" referendum. In a referendum, the expression of voter will is direct, and there is no need to assure that the voters' views will be adequately represented through their representatives in the legislature. The policy impact of a referendum is also different in kind from the impact of choosing representatives. [I]nstead of sending legislators off to the state capitol [or county commission] to vote on a multitude of issues the referendum puts one discrete issue to the voters.[123]

As such, the Supreme Court recognized that the one person, one vote principle differs in cases involving referendum votes and those involving representative elections.[124] Thus, the Court finds that referendum votes, unlike representative elections, do not fall cleanly within the bounds of the one person, one vote principle.

Plaintiffs contend that the Court should apply the one person, one vote principle—and by extension, strict scrutiny—to the provisions at issue here. However, the district court in *Town of Lockport* concluded that *Reynolds v. Sims* controlled its reasoning and held that the dual-majority

---

[122]    *Id.* at 265.

[123]    *Id.* at 266.

[124]    *See id.*

voting requirement in that case violated the one person, one vote principle.[125]  The Supreme

Court disagreed with this analysis, stating that strict scrutiny would be applicable only if "all

voters in [the] county have identical interests in the adoption of a new county charter regardless

of where they reside in the county."[126]  Indeed, the Supreme Court did not find that to be the

case, instead recognizing that "the challenged provisions of New York law rest[ed] on the State's

identification of the distinctive interests of the residents of the cities and towns within a county

rather than their interests as residents of the county as a homogenous unit."[127]

This Court declines Plaintiffs' implicit invitation to overrule established Supreme Court

precedent and will instead adhere to the principles articulated in *Town of Lockport*.  As the *Town

of Lockport* court did not strictly apply the one person, one vote principle to the New York

referendum vote at issue there, this Court will not apply it to the dual-majority voting

requirement at issue here.  As such, the Court now turns to the essence of Plaintiffs' Equal

Protection claim when viewed through the *Town of Lockport* lens: whether the classification of

Shelby County residents into city and non-city residents for a county consolidation referendum

vote is justifiable under the Equal Protection clause.

### Classification based on city and non-city residency

Before the Court can reach the merits of Defendants' Motion to Dismiss this aspect of

Plaintiffs' Equal Protection claim, it must determine which level of scrutiny the *Town of*

---

[125]     *Town of Lockport*, 430 U.S. at 265.

[126]     *Id.* at 268.     Additionally, the Supreme Court went on to note that classifications arising from "the differing interests of city and non-city voters in the adoption of a new county charter" were sufficient and justifiable under the Equal Protection clause in the referendum vote context.  *Id.* at 271-72.

[127]     *Id.* at 268-69.

*Lockport* court applied: rational basis or strict scrutiny.  Upon noting that the New York law at issue "no more than recognize[d] the realities" of the substantially differing electoral interests possessed by voters in the constituent units "directly and differentially affected by the restructuring of county government," the Supreme Court "[g]rant[ed] to these provisions the presumption of constitutionality to which every duly enacted state and federal law is required."[128]

As such, the Court finds that the Supreme Court in *Town of Lockport* applied rational basis review to the provisions before it for two reasons.  First, the Supreme Court noted that the provisions were presumed constitutional, and rational basis is the only Equal Protection classification scrutiny level which presumes the law at issue to be constitutional.  Second, the classification applied by New York law—city and non-city voters—is not one of the suspect or quasi-suspect classifications recognized by the Supreme Court in its Equal Protection jurisprudence: race, national origin, alienage, gender, or legitimacy.  As such, the Court finds that the Supreme Court applied rational basis review in *Town of Lockport*.[129]

Therefore, the Court will apply rational basis to its review of the provisions challenged in this specific claim.  However, for the same reasons articulated above in the Court's examination of Plaintiffs' race-based vote dilution claim, the Court will refrain from dismissing Plaintiffs' city versus non-city vote dilution claim.  Again, the parties' briefing does not fully explain how the constitutional and statutory provisions either do or do not rest upon a rational basis.  Without

---

[128]     *Id.* at 272-73.

[129]     Of course, the provisions at issue in *Town of Lockport* did "not appear to be the sustained product of either an entrenched minority or a willful majority."  *Id.* at 272 n.18.

full briefing on the issue, the Court hesitates to foreclose Plaintiffs' claim on the basis of *Town of Lockport* alone. Moreover, although Defendants extensively discuss the provisions' legislative history in their Motion and argue that the same interests recognized by the Supreme Court in *Town of Lockport* were considered by the General Assembly in 1953, the Court is merely testing the sufficiency of Plaintiffs' pleading, and any consideration of evidence outside the Complaint would be inappropriate. Furthermore, the parties will engage in discovery on Plaintiffs' race-based vote dilution claim, and that discovery may overlap with the issues present in their residency-based vote dilution claim.

Therefore, the Court finds that Plaintiffs have stated a claim for residency-based vote dilution in violation of the Equal Protection clause. The Court will evaluate the parties' future briefing using a rational basis review as implied in *Town of Lockport*. Accordingly, Defendants' Motion to dismiss this aspect of Plaintiffs' Equal Protection claim is **DENIED**.

## Voting Rights Act

The Voting Rights Act provides as follows:

> No voting qualification or prerequisite to voting or *standard, practice, or procedure* shall be imposed or applied by any State or political subdivision in a manner which results in a *denial or abridgement of the right of any citizen of the United States to vote* on account of race or color, or in contravention of the guarantees set forth in [§] 1973b(f)(2) of this title, as provided in subsection (b) of this section.[130]

This statutory language demonstrates that the Voting Rights Act can be violated in two ways: by denying or abridging the right of any U.S. citizen to vote because of race or color or by proving a violation under subsection (b) below. The first violation is couched in the language of the

---

[130]    42 U.S.C. § 1973(a) (emphasis added).

Fifteenth Amendment, and any analysis arising under that provision would necessarily follow

Fifteenth Amendment vote dilution jurisprudence. Statutorily defined violations of the Voting

Rights Act occur

> if, based on the totality of circumstances, it is shown that the political processes
> leading to nomination or election in the State or political subdivision are *not
> equally open to participation by members of a class of citizens protected by
> subsection (a) of this section in that its members have less opportunity than other
> members of the electorate to participate in the political process and to elect
> representatives of their choice*. The extent to which members of a protected class
> have been elected to office in the State or political subdivision is one
> circumstance which may be considered: *Provided,* That nothing in this section
> establishes a right to have members of a protected class elected in numbers equal
> to their proportion in the population.[131]

Moreover, "the essence of a [Voting Rights Act § 2] claim is that a certain electoral law,

practice, or structure interacts with social and historical conditions to cause an inequality in the

opportunities enjoyed by black and white voters to elect their preferred representatives."[132]

To establish a vote dilution claim under the Voting Rights Act, the Supreme Court has

articulated three factors whose "conjunction" is generally necessary to show an impediment of

"the ability of minority voters to elect representatives of their choice."[133] First, "the minority

group must be able to demonstrate that it is sufficiently large and geographically compact to

---

[131]     *Id.* § 1973(b) (emphasis added).

[132]     *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

[133]     *Id.* at 49. The cases citing these factors refer to them interchangeably as factors, elements, and even "pre-conditions;" it appears to the Court that while they are more commonly referred to as factors, they function as elements. While these terms may seem interchangeable, courts weigh, measure, and balance factors, and a claim can be stated even though not all factors are pled. However, elements are far more formulaic in their requirements: failure to plead even one element can render an entire claim invalid.

constitute a majority in a single-member district."[134]  Second, "the minority group must be able

to show that it is politically cohesive."[135]  Third, "the minority must be able to demonstrate that

the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's

preferred candidate."[136]  This last factor "demonstrates that [the minority group's] submergence

in a white multimember district impedes its ability to *elect its chosen representatives*."[137]  The

second and third *Gingles* "thus require a court to consider the voting behavior of different

races."[138]  But these two factors are necessarily different.  The second factor "asks merely

whether voters of the same race tend to vote alike, and the [third factor] evaluates whether a

'bloc-voting majority can routinely outvote' the minority, thereby 'impair[ing] the ability of a

protected class to elect candidates of its choice.'"[139] While these factors must not be

"mechanically applied . . . without regard to the nature of the claim,"[140] plaintiffs must still allege

them to make out a vote dilution claim under the Voting Rights Act.[141]

     Once a plaintiff satisfies the three *Gingles* factors, courts next perform the "totality of the

circumstances" analysis required by § 1973(b)'s statutory text.  When it amended the Voting

---

[134]     *Id.* at 50.

[135]     *Id.* at 51.

[136]     *Id.*

[137]     *Id.* (emphasis added).

[138]     *Cousin v. Sundquist*, 145 F.3d 818, 823 (6th Cir. 1998).

[139]     *Id.*

[140]     *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

[141]     *See Mallory v. Ohio*, 173 F.3d 377, 386 (6th Cir. 1999).

Rights Act in 1982, the U.S. Senate articulated a total of nine factors which courts have used to

evaluate the totality of the circumstances:

> 1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> 2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. The extent to which the State or Political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> 4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> 5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

> 6. Whether political campaigns have been characterized by overt or subtle racial appeals;

> 7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

> 8. Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

> 9. Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.[142]

### Applicability of the Voting Rights Act to Consolidation Referenda

In their Motion, Defendants cite to the Voting Rights Act's statutory text and point to the

---

[142]    S. Rep. No. 97-417, 24-25 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07.

absence of allegations that the dual-majority voting requirement causes African-American voters in Shelby County as a whole to have "less opportunity than other members of the electorate to participate in the electoral process."[143]  In their Response, Plaintiffs skip the issue of the Voting Rights Act's applicability to the consolidation referendum vote at issue and instead focus their arguments on the merits of their Voting Rights Act claim, which are discussed below.[144]  Given the lack of binding precedent in this area, the Court finds that it must thoroughly evaluate whether the Voting Rights Act applies to single shot referenda of the sort presented by this case before proceeding to the sufficiency of Plaintiffs' Complaint under the Voting Rights Act.

As with any statute, the Court begins its evaluation with the statute's text.  The Voting Rights Act appears to present two ways for plaintiffs to state a claim challenging a "voting qualification, prerequisite to voting, or standard, practice, or procedure," joined by the disjunctive "or."[145]  First, plaintiffs can allege a "denial or abridgement of the right of any citizen of the United States to vote."  This language, couched in the Fifteenth Amendment, essentially extends coverage under the Voting Rights Act to actions which would violate the Fifteenth Amendment.  Here, Plaintiffs allege a vote dilution claim under the Voting Rights Act.  As the Court has addressed above, current law does not give rise to vote dilution as a viable cause of action under the Fifteenth Amendment.  Thus, even if the Complaint indicated that Plaintiffs

---

[143]     (Defs.' Mot. to Dismiss, D.E. # 56-1, at 25.)  The Court found the Voting Rights Act discussion in Eric Setterlund's Note helpful in its research on this issue.  *See generally* D. Eric Setterlund, Note, *Two Claims, Two Keys—Overcoming Tennessee's Dual-Majority Voting Mechanism to Facilitate Consolidation Between Memphis City and Shelby County*, 41 U. Mem. L. Rev. 933 (2011).

[144]     (Pls.' Resp., D.E. # 63, at 18.)

[145]     42 U.S.C. § 1973(a).

brought suit under this specific provision of the Voting Rights Act, they would not be able to successfully state a claim for vote dilution under that specific provision of the Voting Rights Act.

Alternatively, plaintiffs can allege violations arising under the terms of subsection (b). 42 U.S.C. § 1973(b) provides for an alternative violation with two distinct prongs, joined by the conjunctive "and:" violations arise if "members have less opportunity than other members of the electorate to participate in the political process *and* to elect representatives of their choice."[146] Thus, the plain language of this part of the Voting Rights Act appears to allow for violations of its terms only when two requirements are satisfied: less opportunity to participate in the political process *and* less opportunity to elect representatives of their choice.

Here, Plaintiffs' Complaint makes no mention of the first method of violating the Voting Rights Act. The Complaint does not couch the alleged violation in terms of "denial or abridgment of the right of minorities to vote." Rather, Plaintiffs appear to bring suit under § 1973(b), as their Complaint states that the dual-majority voting requirement denies African-American voters "an equal opportunity to participate in the electoral process"—rather than "political process," which is the actual phrase used in the Voting Rights Act. Moreover, Plaintiffs leave off the second prong of a § 1973(b) violation: they do not allege that the dual-majority voting requirement reduces their opportunity "to elect representatives of their choice." Despite this omission, the Court interprets Plaintiffs' Complaint as bringing a challenge under § 1973(b) rather than the Voting Rights Act's Fifteenth Amendment language.

In the case at bar, the dual-majority voting requirement does not apply to an election of any sort of representative; rather, it applies to a single-shot referendum vote on whether to accept

---

[146]     *Id.* § 1973(b) (emphasis added).

a proposed charter for a consolidated city and county government. As such, based on the facial language of the statute, it appears that a claim for vote dilution in the context of Tennessee's consolidation referendum voting structure would not fall within the statutory bounds of the Voting Rights Act.

Whether the Voting Rights Act's requirement that a minority group have less opportunity "to elect representatives of their choice" extends to votes which do not involve representatives is an issue of relative first impression. The Court could find only two cases[147]—neither of which are binding precedent—addressing this specific issue, and both held that the Voting Rights Act extends to "issue elections." First, in *Armstrong v. Allain*, the defendants based their argument on the Voting Rights Act's inapplicability to a school bond referenda approval procedure on the same phrase which currently gives this Court pause: the requirement that minority groups have less opportunity "to elect representatives of their choice."[148] The court extensively reviewed the Voting Rights Act's legislative history and text and noted that the defendants' argument was reasonable in light of the text of the Voting Rights Act.[149]

But when viewing "that language in the context of the Act as a whole, and further considering the intent of Congress both in . . . enacting and . . . amending § 2, and finally, in

---

[147] The Court did find a third case addressing a similar issue, but that case merely mentioned the distinction between voting on a single issue and electing a representative in passing. *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1000 (D.S.D. 2004) (noting that the court would give "no weight" to ballot-issue elections because the defendants did not explain "why or how Indian voting behavior with regard to ballot issues would be probative of vote dilution"). Therefore, the Court does not find this case particularly probative or relevant to the issues before it, and it will not rely on it in its analysis.

[148] *Armstrong v. Allain*, 893 F. Supp. 1320, 1323 (S.D. Miss. 1994).

[149] *Id.* at 1326.

heeding the Supreme Court's insistence that the Act be broadly interpreted to afford coverage," the court rejected the defendants' position and held that issue elections such as Mississippi school bond referenda's 60% majority approval requirement before it fell within the Voting Rights Act's "to elect representatives of their choice" language.[150]  Similarly, a court in the Eastern District of Michigan cited *Allain* with approval and noted that "[i]n light of the section's broad language, the legislative history, and the broad construction required in light of the statute's remedial purposes, the Court concludes that [the Voting Rights Act] applies to the initiative petition process at issue in this case."[151]

Based on the broad remedial purpose behind the Voting Rights Act and the extensive legislative history as reflected in *Allain*, the Court concludes that the Voting Rights Act applies to the referendum vote's dual majority requirement.  Although the city-county consolidation vote at issue does not appear to fall within the Voting Rights Act's statutory text, as it in no way involves an election of representatives, given courts' broad interpretations of the Voting Rights Act, the Court finds it prudent to step beyond the bounds of the Voting Rights Act's language. Particularly persuasive is the U.S. Attorney General's testimony before Congress prior to the enactment of the Voting Rights Act: he noted that "every election in which registered voters are permitted to vote would be covered [by the Act]."[152]  This testimony, combined with the broad remedial purpose of the Voting Rights Act as demonstrated by its legislative history and the

---

[150]     *Id.*

[151]     *Operation King's Dream v. Connerly*, No. 06-12773, 2006 WL 2514115, at *14 (E.D. Mich. Aug. 29, 2006).  The case arose from allegations of "racially-targeted voter fraud to obtain signatures in support of an initiative petition to plan an anti-affirmative action proposal on the November 2006 general election ballot."  *Id.* at *1.

[152]     *Allain*, 893 F. Supp. at 1323 (citation omitted).

regulations promulgated under its different sections, persuades the Court that declaring the Voting Rights Act inapplicable to the referendum vote at issue would be contrary to the spirit of the Act.  Therefore, the Court finds that the Voting Rights Act applies to Plaintiffs' claim of vote dilution based on interference with their ability to participate in the electoral process.  Thus, the Court next turns to whether Plaintiffs have successfully stated a claim for vote dilution in violation of the Voting Rights Act.

### Violation of the Voting Rights Act

The Complaint lists racially-based population statistics for the population of Memphis and Shelby County.[153]  Plaintiffs then recount the history of discrimination suffered by African-American Memphis citizens, which continued nearly unabated from the 1800s until the 1960s and 1970s.[154]  The Complaint then succinctly recites the three *Gingles* factors and notes that "voting in Memphis and Shelby County has historically been racially polarized."[155]  Notably, Plaintiffs state that Section 2 of the Voting Rights Act "forbids any electoral system that denies African-Americans an equal opportunity to that afforded to other members of the electorate to participate in the electoral process."[156]  They assert that "Tennessee's dual-majority voting requirement dilutes African-American voting strength in Shelby County and denies African-

---

[153]    (Compl. ¶ 42-43.)

[154]    (*Id.* ¶ 46.)

[155]    (*Id.* ¶ 47-49, 51.)  For good measure, Plaintiffs also point to African-Americans' socioeconomic disparities suffered in part as a legacy of discrimination.  (*Id.* ¶ 50.)

[156]    (*Id.* ¶ 52.)

American voters residing in Shelby County, as a whole, an equal opportunity to participate in the electoral process."[157]

In their Motion, Defendants begin by noting that Plaintiffs' Complaint "fails to allege any of the facts necessary to establish the three *Gingles* pre-conditions" or the totality of the circumstances test in § 1973(b) and that the facts it does allege are insufficient to allow the Court to "infer more than the mere possibility of misconduct."[158]  Defendants then distinguish between candidate elections and referendum votes and contend that the two selection processes are "not readily interchangeable;" they argue that the Complaint does not specify whether racially polarized voting occurs in representative elections or referendum votes.[159]  Defendants point to the results from the November 2010 referendum as an indication that African-Americans in Shelby County do not vote in a politically cohesive bloc in referendum votes.[160]  Thus, Defendants argue that "even when election returns in effect short-circuit a minority group's voting power—as alleged by . . . Plaintiffs in this case—the electoral structure of the dual-majority vote is not illegal if the defeat represents nothing more than the routine operation of political factors."[161]

In response, Plaintiffs argue that the burden for pleading a claim under the Voting Rights Act is "especially low because it is a broad remedial statute" which should be broadly

---

[157]   (*Id.* ¶ 53.)

[158]   (Defs.' Mot. to Dismiss, D.E. # 56-1, at 25-26, 28.)

[159]   (*Id.* at 26.)

[160]   (*Id.* at 27.)

[161]   (*Id.* at 27-28.)

interpreted.[162] However, they cite pre-*Twombly* and pre-*Iqbal* case law for this proposition, and the Court can find no post-*Twombly* and post-*Iqbal* case law about whether the plausibility pleading standard should be similarly relaxed in post-2009 Voting Rights Act cases. Plaintiffs assert that they alleged each *Gingles* factor explicitly in their Complaint, and they point to various factual paragraphs in their Complaint as supporting each of the three *Gingles* factors, thereby arguing that they satisfy *Twombly* and *Iqbal*'s requirements.[163] They urge the Court not to rely on the November 2010 referendum results presented by Defendant, as one referendum's results may not be probative of bloc voting or vote dilution.[164] Plaintiffs close by stating that they have sufficiently pled a cause of action under the Voting Rights Act, and Defendants' argument that Plaintiffs' Complaint cannot satisfy the Voting Rights Act's "totality of the circumstances" test is premature.[165]

In reply, Defendants rely heavily on *Twombly* and *Iqbal* and argue that the Complaint does nothing more than plead legal conclusions masquerading as facts consistent with a claim under Section 2 of the Voting Rights Act.[166] Specifically, Defendants challenge Paragraphs 44, 45, 47, 48, 50, and 53 as being legal conclusions devoid of factual support and thereby insufficient to support a Voting Rights Act claim under *Twombly* and *Iqbal*'s plausibility

---

[162]   (Pls.' Resp., D.E. # 63, at 16.)

[163]   (*Id.* at 17.)

[164]   (*Id.* at 17-18.)

[165]   (*Id.* at 18.)

[166]   (Defs.' Reply, D.E. # 64, at 8.)

requirement.[167]  In a footnote, they also assert that Plaintiffs' factual allegations regarding the African-American percentages of the population in Memphis and Shelby County are "not relevant to a claim for minority vote dilution."[168]  Defendants contend that more relevant population statistics would be the African-American voting age population, "as an individual not entitled to vote because of age cannot have his [or her] vote diluted."[169]

Despite Plaintiffs' inartful phrasing in their Complaint, the Court finds that they have sufficiently stated a claim under the Voting Rights Act.  The Court recognizes that Plaintiffs cite to pre-*Twombly* case law regarding the lower pleading standard applied to broad remedial statutes such as the Voting Rights Act.  However, other than *Twombly* and *Iqbal*, Defendants have not pointed to authority overturning the long-standing principal that courts should broadly construe complaints alleging violations of the Voting Rights Act.  At this stage of litigation, it is Defendants' burden to demonstrate why various Claims in the Complaint should be dismissed, and Defendants have failed to do so in this case.  Moreover, the Complaint explicitly pleads the *Gingles* factors, and Plaintiffs have pled sufficient facts, such as the history of racial discrimination in Tennessee, to allow the Court to discern factual support for each of the *Gingles* factors.  Although the Court has had to stretch to find this factual support, such a stretch is merited by the broad remedial nature of the Voting Rights Act.  Finally, Plaintiffs' reliance on general population statistics, rather than more relevant statistics such as voting-age population or even the population of registered voters, does not merit dismissal of the Complaint.  The Court

---

[167]  (*Id.* at 8-9.)

[168]  (*Id.* at 9 n.25.)

[169]  (*Id.*)

can adequately apply these general population statistics to Plaintiffs' vote dilution claim, and the Court finds that they raise Plaintiffs' claim for vote dilution to a plausible level.

Therefore, the Court finds that Plaintiffs have sufficiently stated a claim for relief under the Voting Rights Act. Thus, Defendants' Motion to Dismiss Plaintiffs' Voting Rights Act claim is **DENIED**.

<u>Standing of Majority Plaintiffs</u>

In their Motion, Defendants argue that the Majority Plaintiffs cannot demonstrate that their right to vote has been denied or abridge on account of their race or color.[170] Plaintiffs do not respond to this argument. Defendants' challenge to the Majority Plaintiffs' standing raises the same statutory standing argument as addressed in this Order's Fifteenth Amendment section; as such, the Court will not repeat the same law here. Because the Majority Plaintiffs are unable to demonstrate an abridgement or denial of their right to vote based on their race or color, and they do not have less opportunity to participate in the political process and to elect representatives of their choice because of their race, the Court finds that they lack statutory standing to pursue a Voting Rights Act claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion for to dismiss is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**

---

[170]     (Defs.' Mot. to Dismiss, D.E. # 56-1, at 24 n.66.)

S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 2, 2012.