IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| HARRISON KERR TIGRETT, MAXINE SMITH, RUSSELL SUGARMON, REGINA M. SUGARMON, JAMES WESLEY GIBSON, MIKE CARPENTER, and MARTAVIOUS JONES,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT E. COOPER, JR., in his official Capacity as Attorney General of the State of Tennessee, TRE HARGETT, in his official Capacity as Secretary of State of the State of Tennessee, TENNESSEE DEPARTMENT OF STATE: DIVISON OF ELECTIONS, SHELBY COUNTY ELECTION COMMISSION, WILLIAM GIANNINI, ROBERT D. MEYERS, and STEVE STAMSON, in their official capacities as members of the Shelby County Election Commission,<br><br>Defendants,<br><br>and<br><br>TOWN OF ARLINGTON, CITY OF BARTLETT, TOWN OF COLLIERVILLE, and CITY OF GERMANTOWN,<br><br>Intervenor-Defendants. | No. 10-2724-STA-tmp |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
GRANTING INTERVENOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Before the Court are Plaintiffs Harrison Kerr Tigrett, Maxine Smith, Russell Surgarmon,

Regina M. Sugarmon, James Wesley Gibson, Mike Carpenter, and Martavious Jones

(collectively, "Plaintiffs") Motion for Summary Judgment (D.E. # 97), Defendants Robert E. Cooper Junior, Tre Hargrett, Tennessee Department of State: Division of Elections, Shelby County Election Commission, William Giannini, Robert D. Meyers, and Steve Stamson (collectively, "Defendants") Motion for Summary Judgment (D.E. # 98), and Intervenor Defendants Town of Arlington, City of Bartlett, Town of Collierville, and City of Germantown (collectively, the "Suburban Municipalities") Motion for Summary Judgment (D.E. # 100), all filed on May 29, 2013. On June 20, 2013, Plaintiffs filed a Response in Opposition to the Suburban Municipalities' Motion (D.E. # 107) and a Response in Opposition to Defendants' Motion (D.E. # 108). Also on June 20, 2013, Defendants filed a Response in Opposition to Plaintiffs' Motion (D.E. # 109) and the Suburban Municipalities filed a Response in Opposition to Plaintiffs' Motion (D.E. # 110). On June 3, 2013, Defendants filed a Reply in support of their Motion (D.E. # 113). On July 5, 2013, Plaintiffs filed a Reply to the Suburban Municipalities' Response to their Motion (D.E. # 114) and a Reply to Defendants' Response to their Motion (D.E. # 115). Also on July 5, 2013, the Suburban Municipalities filed a Reply in support of their Motion (D.E. # 116). For the reasons discussed below, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, **GRANTS** Defendants' Motion for Summary Judgment and **GRANTS** Intervenor Defendants' Motion for Summary Judgment.

## BACKGROUND

Except where noted, the Court finds the following facts undisputed for purposes of summary judgment.

Article XI, section 9 of the Tennessee Constitution and Tennessee Code Annotated section 7-2-106 govern the procedures for the consolidation of city and county governments into

one metropolitan government. In November 1953, Article XI, Section 9 of the Tennessee Constitution was amended as follows:

> The General Assembly may provide for the consolidation of any or all of the governmental and corporate functions now or hereafter vested in municipal corporations with the governmental and corporate functions now or hereafter vested in the counties in which such municipal corporations are located; provided, such consolidations shall not become effective until submitted to the qualified voters residing within the municipal corporation and in the county outside thereof, and approved by a majority of those voting within the municipal corporation and by a majority of those voting in the county outside the municipal corporation.

Tenn. Const. art. XI, § 9. Subsequently, the Tennessee General Assembly adopted enabling legislation for Article XI, Section 9, which provides that any metropolitan charter cannot be adopted unless it is approved by both a majority of the qualified voters residing in the principal city in the county and a majority of the qualified voters residing outside the principal city in the county. Tenn. Code Ann. § 7-2-106(b)-(d). This is referred to as the dual-majority voting requirement.

On August 6, 2009 and September 15, 2009 the governing bodies of the City of Memphis and Shelby County, Tennessee ("Shelby County") adopted resolutions establishing the Memphis and Shelby County Metropolitan Government Charter Commission (the "Charter Commission"). The Charter Commission was established to write and propose to the voters of Shelby County the charter for a metropolitan government comprised of the consolidated governments of the City of Memphis and Shelby County. On August 9, 2010, the Charter Commission adopted the Charter of the Memphis Shelby County Metropolitan Government (the "Metropolitan Charter"). On August 10, 2010, the Charter Commission filed the Metropolitan Charter with the Shelby County Election Commission, requesting that the Charter and the name of the new government be placed on a ballot to be presented to the voters of the City of Memphis and Shelby County in a referendum election to be held November 2, 2010.

The referendum was held on November 2, 2010. (Shelby County Election Commission Certified Election Results, D.E. # 98-8.) A total of 224,355 persons in Shelby County voted in the November 2010 consolidation referendum. (*Id.*) Of that amount, 142,758 persons, or 63.3% of the voters in Shelby County, voted against the consolidation referendum. (*Id.*) 81,597 persons, or 36.4% of the voters, voted in favor of the consolidation referendum.[1] (*Id.*) In the City of Memphis, a total of 133,719 persons voted in the referendum. (*Id.*) Of that amount, 65,756 persons, or 49.2% of the voters, voted against the consolidation referendum. (*Id.*) 67,963 persons, or 50.8% of the voters, voted in favor of the referendum. (*Id.*)

Had the consolidation referendum passed, the Suburban Municipalities would have continued to exist, but each of the smaller municipalities would have become part of the general services district.[2] Under the proposed charter for the consolidated government, the fiscal responsibility for numerous Memphis City services would have transferred to the general services district.[3] (Lawton Aff. ¶ 4, Int. Defs.' Ex. 1.1, D.E. # 100-3.) Those expenses would have become part of the general services district budget, funded in large part by the general

---

[1] According to the Suburban Municipalities, 84.96% of the voters in Shelby County residing outside the City of Memphis voted against the consolidation while 15.04% voted in favor of it. These numbers vary from the totals cited to by Defendants. However, Plaintiff marks both as undisputed. The Suburban Municipalities cite to Defendants' Motion to Dismiss (D.E. # 56) in support of this fact. As this is not evidence in the record to which the Suburban Municipalities may cite in support of their proffered facts, the Court takes the figures provided by Defendants (and indicated in the text above) as undisputed for purposes of summary judgment.

[2] Tenn. Code Ann. § 7-2-107(e).

[3] Plaintiffs mark this fact as disputed on the grounds that they moved to strike Patrick Lawton's affidavit. The Court has denied that Motion. Plaintiffs do not provide any other to dispute this fact and proffer no other reason in support of their dispute other than that this fact is immaterial and irrelevant to the resolution of Plaintiffs' residency-based equal protection claim. Therefore, the Court takes this fact as undisputed for purposes of summary judgment.

services property tax.[4]  (*Id.*)  The residents of the Suburban Municipalities and unincorporated sections of Shelby County would have become responsible for the operating expenses of the urban services district (formerly the City of Memphis).[5]  (*Id.* ¶ 5.)  Concurrently, residents of the Suburban Municipalities and the unincorporated areas of Shelby County would continue to pay for their own municipal services through their own municipality property taxes.[6]  (*Id.* ¶ 6.)

Each of the Suburban Municipalities has annexation reserve areas established by the Agreements on Areas Reserved for Annexation between the City of Memphis and the six other municipalities of Shelby County.  (Annexation Reserve Agreements, D.E. # 67-1.)  The agreements reserve areas that each municipality may annex.  (*Id.*)  However, according to the Tennessee Attorney General, the Annexation Reserve Agreements would have been nullified had a consolidated metropolitan government been approved.[7]  (Opinion No. 10-109, D.E. # 53-4.)

Plaintiffs' experts analyzed five elections in Shelby County, all of which were representative elections involving candidates.  (Expert Report of Dr. Marcus Pohlmann, D.E. #

---

[4] Plaintiffs mark this fact as disputed on the same grounds as the previous fact.  For the same reasons discussed above, the Court takes this fact as undisputed for purposes of summary judgment.

[5] Plaintiffs mark this fact as disputed on the same grounds as the previous fact.  For the same reasons discussed above, the Court takes this fact as undisputed for purposes of summary judgment.

[6] Plaintiffs mark this fact as disputed on the same grounds as the previous fact.  For the same reasons discussed above, the Court takes this fact as undisputed for purposes of summary judgment.

[7] Plaintiff objects to this fact on the grounds that it constitutes a legal conclusion and not a fact. However, the pertinent inquiry is whether this *could* have happened, not whether it *would* have happened.  *See Town of Lockport*, 430 U.S. at 271-72 (holding that it is a sufficiently differing interest to justify a dual-majority voting requirement where consolidation could shift pre-existing balances in the services provided by separate municipalities).  As Plaintiffs do not dispute that this is what the Attorney General's Opinion states, the Court takes this fact as undisputed for purposes of summary judgment.

98-3; Expert Report of Dr. Sekou Franklin, D.E. # 98-4.) Neither of Plaintiffs' experts conducted any independent analysis of any referendum elections in Shelby County, including the November 2010 consolidation referendum. (Expert Report of Dr. Marcus Pohlmann; Expert Report of Dr. Sekou Franklin.)[8] Defendants' expert Dr. Todd Donovan analyzed six referendum elections held in Shelby County since 2006, including the November 2010 consolidation referendum, and concluded that the majority of the African-American voters were on the winning side in each referendum election. (Suppl. Report of Dr. Donovan at 10, D.E. # 98-7.)

## STANDARD OF REVIEW

The standard of review for cross motions for summary judgment is the same as when a single party moves for summary judgment.[9] A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] In reviewing a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence[,]"[11] but instead must view the evidence in the light most favorable to the nonmoving party.[12] When the movant supports their

---

[8] Plaintiffs mark this fact as disputed, arguing that their expert Dr. Pohlmann provided an analysis of the referenda elections reviewed by Defendants' expert Dr. Donovan and concluded that they were irrelevant to the issues in this case. (Pohlmann Supplemental Report at 2, D.E. # 108-2.) However, the Court finds that Dr. Pohlmann did not conduct his own analysis of any referenda elections, but instead summarized Dr. Donovan's analysis and concluded that these referenda were irrelevant to this case. (*Id.*) The Court takes up below the issue of what elections are relevant in this case and finds that it is undisputed for purposes of summary judgment that Plaintiffs' experts did not conduct an analysis of any referenda elections.

[9] *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

[10] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[11] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[12] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

motion with documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[13] It is not sufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts."[14] These facts must constitute more than a scintilla of evidence, and must rise to the level that a reasonable juror could find by a preponderance of the evidence the nonmoving party is entitled to a verdict.[15] To determine whether it should grant summary judgment, the court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[16]

A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial."[17] The Sixth Circuit interprets this to mean that "the nonmoving party . . . 'put up or shut up' [on] the critical issues of his asserted causes of action."[18] "When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party."[19]

---

[13] *Celotex*, 477 U.S. at 324.

[14] *Matsushita*, 475 U.S. at 586.

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[16] *Id.* at 251-52.

[17] *Celotex*, 477 U.S. at 322.

[18] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[19] *Wiley v. United States (In re Wiley)*, 20 F.3d 222, 224 (6th Cir. 1994).

## ANALYSIS

Plaintiffs' Complaint alleges that Tennessee's dual-majority vote requirement violates the Fourteenth Amendment, the Fifteenth Amendment, and section two of the Voting Rights Act of 1965. Plaintiffs allege that the dual-majority voting requirement violates the Fourteenth Amendment in two ways: by diluting the vote of minority voters in the City of Memphis and by diluting the vote of residents of the City of Memphis as a whole. In its Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (D.E. # 80), the Court dismissed Plaintiffs' Fifteenth Amendment Claim. Therefore, only Plaintiffs' two Fourteenth Amendment claims and their Voting Rights Act claim are at issue at this stage of the litigation. The Court will take up each in turn.[20]

### Race-Based Equal Protection Claim

Plaintiffs concede that summary judgment in favor of Defendants is appropriate as to their race-based equal protection claim and assert in their Response to Defendants' Motion for Summary Judgment that they are no longer pursuing this claim.[21] Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the race-based equal protection claim.

### Residency-Based Equal Protection Claim

Plaintiffs allege that the dual-majority voting requirement, which treats residents of the City of Memphis differently from residents of Shelby County outside Memphis, is an unconstitutional violation of the Fourteenth Amendment Equal Protection clause because it impermissibly dilutes the voting strength of voters within the City of Memphis. As this Court

---

[20] The Court permitted the Suburban Municipalities to intervene only as to the residency-based claims and therefore they did not move for summary judgment on this claim.

[21] (Pls.' Resp. to Defs.' Mot. for Summ. J. at 2, D.E. # 108.)

already held in its Order on Defendants' Motion to Dismiss, the framework set out by the Supreme Court in *Town of Lockport v. Citizens for Community Action at the Local Level*[22] applies in this case.[23] The *Town of Lockport* Court recognized that there is a difference between cases involving candidate elections and those involving referenda or "single-shot" elections.[24] The Supreme Court explained that because a referendum puts a discrete issue to the voters,

> [t]hat issue is capable . . . of being analyzed to determine whether its adoption or rejection will have a disproportionate impact on an identifiable group of voters. If it is found to have such a disproportionate impact, the question then is whether a State can recognize that impact either by limiting the franchise to those voters specially affected or by giving their votes a special weight.[25]

Thus, the controlling question is "whether there is a genuine difference in the relevant interests of the groups that the state electoral classification has created; and, if so, whether any resulting enhancement of minority voting strength nonetheless amounts to invidious discrimination in violation of the Equal Protection Clause."[26] Strict scrutiny is applicable only if the answer to that question is no, because "all voters in [the] County have substantially identical interests" in the adoption of the referendum.[27]

---

[22] 430 U.S. 259 (1977).

[23] (Order Granting in Part and Den. in Part Defs.' Mot. to Dismiss at 36-37, D.E. # 80.)

[24] *Town of Lockport*, 430 U.S. at 266 ("The equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives are of limited relevance, however, in analyzing the propriety of recognizing distinctive voter interests in a 'single-shot' referendum.").

[25] *Id.*

[26] *Id.* at 268.

[27] *Id*.

9

*Distinct Interests*

Plaintiffs argue that the Court incorrectly determined that *Town of Lockport*'s rational basis test[28] applies in this case, because there are no distinct interests between the residents of the City of Memphis and the residents of Shelby County outside of Memphis. Rather, they argue, all voters have identical interests, and therefore the Court should apply strict scrutiny. However, the undisputed evidence does not support Plaintiffs' position. Although Plaintiffs' expert Dr. Pohlmann opined that there are no distinct interests, his conclusory statement is insufficient where the weight of the evidence shows that the state could reasonably have concluded that distinct interests between the principal city and the county exist to justify the dual-majority vote requirement.

Contrary to Plaintiffs' position, the evidence shows the dual-majority voting requirement was enacted in recognition of the different interest of city residents versus non-city residents in any county that might face consolidation. The focus of the Court's analysis remains "not on the perceptions of voters in a particular county, but on whether the State might legitimately view their interests as sufficiently different to justify a distinction between city and [county] voters."[29] However, a close look at Shelby County provides insight into how the state could have viewed as

---

[28] The Court recognizes that the *Town of Lockport* Court did not explicitly state that it was employing a rational basis test. However, as noted in the Order on Defendants' Motion to Dismiss, the Court finds that the *Town of Lockport* Court applied rational basis to the provisions before it because "the Supreme Court noted that the provisions were presumed constitutional, and rational basis is the only Equal Protection classification scrutiny level which presumes the law at issue to be constitutional." Additionally, "the classification applied by New York law—city and non-city voters—is not one of the suspect or quasi-suspect classifications recognized by the Supreme Court in its Equal Protection jurisprudence." (Order Granting in Part and Den. in Part Defs.' Mot. to Dismiss at 38.)

[29] *Town of Lockport*, 430 U.S. at 270 n.17.

distinct the interests of residents residing in the city versus residents outside the city in any consolidation referendum.

The voters of Shelby County have a separate and distinct interest in consolidation because of the different impact consolidation would have on areas such as taxes, contractual rights to annexation, and the special interests of the voters in the Suburban Municipalities. For example, under consolidation, even where the Suburban Municipalities would continue to exist, the smaller municipalities would become part of the general services district.[30] Fiscal responsibility for numerous Memphis City services would have transferred to the general services district, so the residents of the Suburban Municipalities, as general services district tax payers, would have become responsible for the operating expenses of the urban services district.[31] Concurrently, residents of the Suburban Municipalities and the unincorporated areas of Shelby County would continue to pay for their own municipal services through their own municipality property taxes.[32] Therefore, those residents had distinct interests from the residents of the City of Memphis, who would not have faced such a problem. Additionally, each of the Suburban Municipalities has annexation reserve areas established by the Agreements on Areas Reserved for Annexation between the City of Memphis and the six other municipalities of Shelby County.[33] The agreements reserve areas that each municipality may annex.[34] However, according to the Tennessee Attorney General, the Annexation Reserve Agreements would have

---

[30] Tenn. Code Ann. § 7-2-107(e).

[31] (Lawton Aff. ¶ 4-5.)

[32] (*Id.* ¶ 6.)

[33] (Annexation Reserve Agreements, D.E. # 67-1.)

[34] (*Id.*)

11

been nullified had the voters approved a consolidated metropolitan government.[35] Thus, the residents of the Suburban Municipalities have a distinct interest in consolidation from residents of the City of Memphis who would not lose such annexation rights.

Further, although the City of Memphis could also see changes similar to the changes faced by the Suburban Municipalities in areas such as taxes, utilities, and schools, it would obtain the benefit of consolidation along with those changes, while the Suburban Municipalities and the unincorporated areas in Shelby County would not. Because of this, the residents inside the City of Memphis and those in the County outside Memphis have differing interests in whether Memphis consolidates with Shelby County. The State could have foreseen such differences in any city and county facing consolidation when it enacted the dual-majority vote requirement.

Moreover, the Supreme Court in *Town of Lockport* noted that "the later intervention of the town of Lockport to protect its voters' special interests in the issue" appeared to contradict the assertion that no group involved had distinct interests from another group.[36] Similarly, here, the intervention of the Suburban Municipalities in this case to protect their voters' special interests reveals that residents of Shelby County have separate and distinct interests from residents of the City of Memphis in the adoption of a consolidated government. Thus, like in *Town of Lockport*, the "separate voter approval requirements are based on the perception that the real and long-term impact of a restructuring of local government is felt quite differently by the" residents of the principal city and the residents of the county (here, the residents of the City of

---

[35] (Opinion No. 10-109, D.E. # 53-4.)

[36]*Town of Lockport*, 430 U.S. at 270 n.17.

12

Memphis and the residents of Shelby County outside Memphis, including the Suburban Municipalities).[37]

<u>*Whether Distinct Interests Justify Classification*</u>

Because the two voting groups have distinct interests in the consolidation of the City of Memphis and Shelby County, the Court must determine whether "those differences are sufficient under the Equal Protection clause to justify the classifications made by" the dual-majority requirement.[38] The Court finds that they are. As discussed above, voters in Shelby County are "directly and differentially affected"[39] by the consolidation of Shelby County and Memphis. Voters in these two groups are differently affected by the consolidation because while residents of both Shelby County outside Memphis and residents of the city of Memphis would see, for example, their taxes, utilities, and annexation agreements change because of consolidation, only those residents inside the City of Memphis would obtain the benefits of consolidation along with those changes. Thus, the dual-majority requirement is "based on the perception that the real and long-term impact of a restructuring of local government is felt quite differently by the different county constituent units,"[40] and therefore sufficiently justifies the classification between county and city voters.

Further, the dual-majority voter requirement reflects a state-wide policy that protects local autonomy by insulating existing local governments from dissolution or alteration without their consent. As the Tenth Circuit has pointed out, "the Supreme Court has consistently favored

---

[37] *Id.* at 271-72.

[38] *Id.* at 271.

[39] *Id.* at 272.

[40] *Id.* at 271-72.

13

the political judgments of state legislatures in structuring political subdivisions within states and defining the electoral community making up those entities [and] has consistently upheld laws that give different constituencies different voices in elections, especially those involving the annexation or adjustment of political boundaries."[41] Thus, allowing the residents in the county to vote separately from the residents of the city is justified, given that consolidation would result in a fundamental alteration in the county's status as a branch of government.

Accordingly, "[g]ranting to [the dual-majority requirement] the presumption of constitutionality to which every duly enacted state and federal law is entitled, [the Court is] unable to conclude that [it] violate[s] the Equal Protection Clause of the Fourteenth Amendment."[42] Since Plaintiffs have not met their burden of showing that the dual-majority requirement violates the Equal Protection Clause, the Court finds that summary judgment is appropriate as to the residency-based equal protection claim and **GRANTS** Intervenor Defendants' and Defendants' Motions as to this claim.

## **Voting Rights Act Claim**

Finally, Plaintiffs allege that the dual-majority voting requirement violates section two of the Voting Rights Act, because it impermissibly dilutes the voting strength of African Americans in Shelby County and denies African-American voters in Shelby County an equal opportunity to participate in the electoral process. Section two of the Voting Rights Act provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the

---

[41] *City of Herriman v. Bell*, 590 F.3d 1176, 1184 (10th Cir. 2010).

[42] *Town of Lockport*, 420 U.S. at 272-73.

guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.[43]

Violations of the Voting Rights Act occur

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.[44]

In order to make out a violation of section two, Plaintiffs must first satisfy the three preconditions articulated by the Supreme Court in *Thornburg v. Gingles*.[45] The three preconditions are:

> [1] the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district . . . [2] the minority group must be able to show that it is politically cohesive . . . and [3] the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.[46]

Failure to prove any one of these three preconditions is fatal to a section two claim.[47] If Plaintiffs are able to establish that the three preconditions are met, the Court must then conduct the totality of the circumstances analysis set forth in section 2(b).[48] The totality of the

---

[43] 42 U.S.C. § 1973(a).

[44] *Id.* § 1973(b) (emphasis in original).

[45] 478 U.S. 30 (1986).

[46] *Id.* at 50-51.

[47] *See Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994).

[48] *Id.*; 42 U.S.C. § 1973(b).

circumstances analysis is guided by the following factors, articulated by the United States Senate when it amended the Voting Rights Act in 1982:

> 1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> 2. The extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> 3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> 4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> 5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> 6. Whether political campaigns have been characterized by overt or subtle racial appeals;
>
> 7. The extent to which members of the minority group have been elected to public office in the jurisdiction;
>
> . . .
>
> [8.] Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[;]
>
> [9.] Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.[49]

---

[49] S. Rep. No. 97-417, 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07 (all caps in original).

## *The* Gingles *Preconditions*

Defendants do not dispute that the first two *Gingles* preconditions are satisfied. Thus, the Court turns its attention to the third requirement for a section two violation: whether the majority votes sufficiently as a bloc to enable them to usually defeat the minority's preference.[50] The Court finds that Plaintiffs have failed to make this showing. In order to draw valid inferences and conclusions about voters' behavior from statistics, experts and courts must analyze relevant elections.[51] The Eleventh Circuit has noted that "candidate and referenda elections are not readily interchangeable. . . . 'Voting in referenda is often a more complex process than voting for candidates in office. The issues are usually more complex and policy positions of the electorate may be influenced by a variety of factors.'"[52] Further, as the Supreme Court recognized in *Town of Lockport*,

> [i]n a referendum, the expression of voter will is direct, and there is no need to assure that the voters' views will be adequately represented through their representatives in the legislature. The policy impact of a referendum is also different in kind from the impact of choosing representatives instead of sending legislators off to the state capitol to vote on a multitude of issues, the referendum puts one discrete issue to the voters."[53]

Thus, precedent requires the Court to look at referenda elections in analyzing the third *Gingles* precondition, rather than candidate elections.

Plaintiffs' experts have not analyzed referenda elections at all. Rather, Plaintiffs experts chose to analyze five candidate elections. Therefore, Plaintiffs have not met their burden to

---

[50] *Gingles*, 478 U.S. at 51.

[51] *See*, *e.g., Cousins v. Sundquist*, 145 F.3d 818, 826 (6th Cir. 1998); *Lucas v. Townsend*, 967 F.2d 549, 552 (11th Cir. 1992).

[52] *Lucas*, 967 F.2d at 552.

[53] *Town of Lockport*, 430 U.S. at 266.

17

show that in relevant elections, the majority votes as a bloc, allowing it usually to defeat the minority's choice.

Not only can Plaintiffs not show that this usually happens, they cannot show that it has ever happened with respect to referenda elections. Defendants' expert Dr. Donovan analyzed six referenda elections and concluded that in all referenda elections in Shelby County since 2006, a plurality of African-American voters were on the winning side and that their votes were not diluted by white voters. Even in the consolidation referendum in 2010, the only referendum in which the challenged dual-majority vote requirement was imposed, the majority of African-American voters in both the City of Memphis and Shelby County opposed consolidation. Dr. Donovan explained in his Supplemental Report that a homogenous precinct analysis showed that 63% of the voters in homogenous African-American precincts within the city of Memphis opposed the consolidation referendum.[54] An ecological regression analysis of the same fifty homogenous African-American precincts showed that only 37% of the voters supported the consolidation referendum.[55] An ecological regression analysis of the Shelby County precincts outside the City of Memphis showed that only 26% of African-American voters outside the City of Memphis supported the consolidation referendum.[56] Therefore, Plaintiffs cannot establish that in any situation, including where the dual-majority vote requirement was imposed, majority voters voted in such a way to block the preference of the African-American minority. Without a single example, Plaintiffs simply cannot meet their burden of showing that this is what *usually*

---

[54] (Suppl. Report of Dr. Donovan at 5.)

[55] (*Id.* at 8-9.)

[56] (*Id.* at 9.)

happens. Accordingly, Plaintiffs cannot satisfy the third *Gingles* precondition and Defendants are entitled to summary judgment on Plaintiffs section two claim.[57]

*Totality of the Circumstances*

Because Plaintiffs have failed to satisfy all three *Gingles* preconditions, they cannot make out a violation of section two of the Voting Rights Act.[58] Therefore, the Court need not address the totality of circumstances analysis.

**CONCLUSION**

For the reasons set forth above, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, **GRANTS** Defendants' Motion for Summary Judgment and **GRANTS** Intervenor Defendants' Motion for Summary Judgment.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 17, 2014.

---

[57] The Court permitted the Suburban Municipalities to intervene only as to the residency-based claims and therefore they did not move for summary judgment on this claim.

[58] *See Johnson*, 52 U.S. at 1011.